**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Donald Walker, et al., | No. CV-23-01641-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| AIU Insurance Company, et al., | |
| Defendants. | |

Pending before the Court are several motions in this insurance dispute arising out of a workers' compensation case. This Order addresses: Defendant AIU Insurance Company's ("AIU") Motion for Summary Judgment (Doc. 105); Defendant Gallagher Bassett Services Incorporated's ("Gallagher") Motion for Summary Judgment (Doc. 106); Plaintiffs Donald and Judith Walker's ("Plaintiffs") Motions to Exclude Expert Testimony (Doc. 107, 108), Defendants' Motions to Exclude Expert Testimony (Doc. 102, 103, 104); and Defendants' Motion for Leave to file a Sur-Reply (Doc. 124). Following oral argument, the Court rules as follows.

## I.    BACKGROUND

Plaintiff Donald Walker was employed by Cemex (a non-party to this litigation) as a cement truck driver. (Doc. 132 at 2). On January 13, 2021, Mr. Walker tripped and fell onto concrete blocks, fracturing his ribs and injuring his left shoulder. Defendant AIU is an insurance company that insures Cemex's workers' compensation claims. (Doc. 132 at 2). Defendant Gallagher is a third-party claims adjuster hired by Cemex to adjust Mr.

Walker's claim. (Doc. 105 at 2).

Following his injury, Mr. Walker received treatment at Cemex's industrial clinic, MBI. (Doc. 132 at 2). Mr. Walker was initially treated for fractured ribs but developed shoulder pain in connection with the rib injury. (Doc. 122-9 at 3–4). When Mr. Walker's shoulder pain did not resolve in physical therapy, MBI requested authorization for an orthopedic evaluation and an MRI. (Doc. 122-8 at 3). Mr. Walker received an MRI on March 24, 2021, which revealed rotator cuff and bicep tendinosis, a labral tear, and AC joint arthrosis. (Doc. 122-8 at 4). Following his MRI, Mr. Walker met with orthopedic surgeon Michael Steingart on April 7, 2021, who diagnosed him with adhesive capsulitis. (Doc. 122-8 at 5). After this diagnosis, Defendants authorized treatment for Mr. Walker's shoulder, including multiple orthopedic evaluations, physical therapy, and shoulder injections. (Doc. 132 at 4).

On August 5, 2021, Dr. Steingart requested authorization to perform an arthroscopic surgery. (Doc. 122-8 at 7). Gallagher then referred Mr. Walker to an independent medical examination ("IME") with Dr. Zoltan. (Doc. 122-9 at 13). Dr. Zoltan evaluated Mr. Walker on October 14, 2021, and concluded that his "left shoulder complaints [were] causally related" to the industrial injury. (Doc. 122-8 at 28). Dr. Zoltan found that only the adhesive capsulitis was related to the injury and that the other pathologies identified in the March MRI were pre-existing conditions. (Doc. 122-8 at 29). He agreed that "further active medical care to the left shoulder [was] appropriate," and Mr. Walker was authorized to undergo manipulation under anesthesia. (Doc. 122-8 at 29). Dr. Steingart performed the manipulation under anesthesia procedure on December 14, 2021, but Mr. Walker continued to experience shoulder pain, stiffness, and limited range of motion. (Doc. 122-8 at 33).

Mr. Walker received a second MRI in January 2022, which revealed a complete labral tear. (Doc. 105-2 at 36). In May 2022, Dr. Steingart noted that Mr. Walker's condition had worsened and again recommended arthroscopic surgery. (Doc. 122-8 at 40-41, Doc. 132 at 6). Mr. Walker was referred to Dr. Zoltan for a second IME on May 18, 2022. (Doc. 122-7 at 4). Dr. Zoltan concluded that the labral tear depicted on the MRIs was

not related to the industrial injury. (Doc. 105-2 at 37). He further found that Mr. Walker was medically stationary and did not require further supportive treatment. (Doc. 122-8 at 45). Defendants elected to decline the arthroscopic surgery and Mr. Walker decided not to proceed with the surgery without authorization because "he was short of funds." (Doc. 122-8 at 50). On June 30, 2022, Defendants filed a Notice of Claim Status closing Mr. Walker's claim for active medical care. (Doc. 1-7 at 8, Doc. 105-2 at 34).

A month later, Mr. Walker filed a Request for Hearing before the Industrial Commission of Arizona ("ICA") seeking additional supportive care for his shoulder. (Doc. 105-2 at 34). Following the ICA hearing, the ALJ determined that Mr. Walker was not medically stationary and that his shoulder required further active treatment. (Doc. 105-2 at 37). Dr. Gruber (who took over Mr. Walker's treatment from Dr. Steingart), submitted a request for surgical authorization (Doc. 122-13), which Defendants approved. (Doc. 122-8 at 51). Mr. Walker received shoulder surgery on November 7, 2023. (Doc. 122-13 at 2–3).

While Mr. Walker sought medical care for his rib and shoulder injuries, he simultaneously pursued disability benefits for decreased wages. He returned to work immediately after his fall, but was assigned light duty work and worked fewer hours than he had prior to the injury. (Doc. 122-4 at 8). In September 2021, Mr. Walker's counsel requested a hearing before the ICA to obtain his wage records from Cemex. (Doc. 122-8 at 53). On December 27, 2021, counsel submitted Mr. Walker's first claim for disability benefits due between the period of January 15, 2021 and December 4, 2021. (Doc. 122-8 at 54). Defendants paid the benefits owed for this period on July 6, 2022. (Doc. 122-16 at 5). Mr. Walker's counsel submitted claim forms monthly for ongoing disability benefits. (Doc. 132 at 8). When Defendants failed to timely issue Mr. Walker's disability benefits, his counsel requested hearings before the ICA to obtain payment. (Doc. 122-7 at 5). Benefits owed from March 12, 2022, to April 10, 2022, were received on June 21, 2022. (Doc. 122-16 at 5). Benefits owed from April 11, 2022, to May 17, 2022, were received on July 6, 2022. (Doc. 122-16 at 5).

1    Mr. Walker filed the present action alleging that Defendants acted in bad faith by

2    denying authorization for treatment and delaying the payment of disability benefits. (Doc.

3    1-7 at 9–10). He alleges that Defendants unreasonably delayed his medical treatment,

4    causing his industrial injury to worsen and aggravating his temporary and permanent pain.

5    (Doc. 1-7 at 9). Mrs. Walker alleges she suffered a loss of consortium and emotional

6    distress. (Doc. 1-7 at 10). Defendants now move for summary judgment on Plaintiffs' bad

7    faith, joint and several liability, and punitive damages claims. (Doc. 105, 106).

8    **II.    PROCEDURAL BACKGROUND**

9    On March 21, 2025, AIU and Gallagher each filed Motions for Summary Judgment.

10    (Doc. 105, 106). Those motions are fully briefed. (Doc. 133, 128, 132, 129). Plaintiffs filed

11    two motions to limit or exclude Defendants' experts' testimony (Doc. 107, 108), which are

12    fully briefed (Doc. 112, 116, 111, 117). In connection with one of Plaintiffs' motions to

13    exclude, Defendants filed a Motion for Leave to File a Sur-Reply (Doc 124). Defendants

14    jointly filed three motions to limit or exclude Plaintiffs' experts' testimony. (Doc. 102, 103,

15    104). Those motions are also fully briefed. (Doc. 113, 118, 110, 115, 109, 114).

16    The Court will begin its discussion with the parties' motions to exclude or limit

17    expert testimony, and Defendants' motion to file a sur-reply connected with one of

18    Plaintiffs' motions to exclude. The Court will then address Defendants' individual motions

19    for summary judgment.

20    **III.    PLAINTIFFS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**

21    Plaintiffs filed two motions seeking to exclude expert testimony. (Doc. 107, 108).

22    The motions are fully briefed. (Doc. 112, 116, 111, 117).

23    **A. Legal Standard**

24    Rule 702 of the Federal Rules of Evidence tasks a district court judge with "ensuring

25    that an expert's testimony both rests on a reliable foundation and is relevant to the task at

26    hand." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also*

27    *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1313 (9th Cir. 1995).

28    Rule 702 provides that expert testimony is admissible if:

- 4 -

1

(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

2

3

4

5     *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). To satisfy Rule

6     702: (1) the expert must be qualified, (2) the expert's opinion must be reliable in that it is

7     based on sufficient facts or data and is the product of reliable principles and methods, and

8     (3) the expert's testimony must fit the case such that the expert's opinions are relevant. *See*

9     *Daubert*, 509 U.S. at 588, 591–93. If the proposed testimony is relevant and reliable, its

10    proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge."

11    *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006).

12                                    1.    Qualification

13    As an initial matter, the trial court must determine whether the witness is qualified

14    as an expert by "knowledge, skill, training, or education." *Wagner v. ABW Legacy Corp,*

15    *Inc.*, No. CV-13-2245-PHX-JZB, 2016 WL 880371, at \*5 (D. Ariz. Mar. 8, 2016). Because

16    the rule "contemplates a broad conception of expert qualifications," only a "minimal

17    foundation of knowledge, skill, and experience" is required. *Id.* (quoting *Hangarter v.*

18    *Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). A lack of

19    particularized expertise "goes to the weight of the testimony, not its admissibility." *Id.*

20    (quoting *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993)).

21                                    2.    Reliability

22    Next, the trial court must ensure that the proffered expert testimony is reliable. The

23    test of reliability is flexible and requires the district court to "assess the expert's reasoning

24    or methodology, using as appropriate criteria such as testability, publication in peer-

25    reviewed literature, known or potential error rate, and general acceptance." *City of*

26    *Pomona*, 750 F.3d at 1044. These factors are nonexclusive, and "the trial court has

27    discretion to decide how to test an expert's reliability . . . based on the particular

28    circumstances of the particular case." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564

(9th Cir. 2010)). Ultimately, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318. "Challenges that go to the weight of the evidence are within the province of a fact finder," and "[a] district court should not make credibility determinations that are reserved for the jury." *City of Pomona*, 750 F.3d at 1044.

### 3. Relevance

Finally, the Court has a duty to ensure that the testimony is "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (quoting *Daubert I*, 509 U.S. at 597). Expert testimony is relevant if it assists the trier of fact in understanding evidence or in determining a fact in issue. *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the case. *Id.*

### B. Discussion

Plaintiffs move to limit testimony from Dr. Gendy, and preclude testimony from Dr. Zoltan and "improperly disclosed 'omnibus' non-retained experts." (Doc. 108 at 1). Plaintiffs also move to preclude testimony from John Beringer. (Doc. 107). The Court addresses each in turn.

### 1. Dr. Gendy

Defendants list Dr. Gendy as a retained medical expert. (Doc. 108-8 at 29). Plaintiffs challenge two portions of Dr. Gendy's report. The Court addresses each in turn.

#### a. Treatment Delay

Dr. Gendy opines that "[t]he extended timeline from the original incident in January 2021 to the authorization [for surgery] in August 2023 was primarily due to Mr. Walker's earlier decision to decline SLAP surgery, as documented in Dr. Zoltan's IME report from May 2022." (Doc. 108-1 at 3). Plaintiffs allege that because Dr. Zoltan's IME reports do not say anything about Mr. Walker declining surgery, Dr. Gendy's opinion is based on an inaccurate foundation and is unreliable. (Doc. 108 at 2). Defendants' response cites to a

November 2022 report by Dr. Zoltan, which notes that, in July 2022, Mr. Walker "declined surgery, and supportive care was recommended." (Doc. 111 at 8, Doc. 111-3 at 2). In reply, Plaintiffs concede that, contrary to their initial position, Dr. Zoltan *did* report Mr. Walker's refusal to have surgery. (Doc. 117 at 2). However, Plaintiffs claim the November 2022 report was "previously unknown, and undisclosed," (Doc. 117 at 1), and argue Dr. Gendy should be limited to: (1) his singular opinion that the surgery delay was caused by Mr. Walker declining surgery, and (2) the factual basis stated in his report. (Doc. 117 at 4).

As Plaintiffs concede in their reply, there is a factual basis to support Dr. Gendy's opinion. It appears that Dr. Gendy merely misstated the date of the report that he used to support that opinion. Because this error goes to the weight rather than the admissibility of his testimony, the Court will not preclude or limit his testimony at this time. *City of Pomona*, 750 F.3d at 1044; *see also Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

### b. Accepted Treatments

In summarizing Mr. Walker's diagnoses and treatments, Dr. Gendy notes that "[t]he SLAP was administratively accepted . . . [but] the distal clavicle excision, left shoulder subacromial decompression, were not administratively accepted treatments." (Doc. 108-1 at 3). Plaintiffs characterize this statement as a "legal opinion" and claim the "opinion" is an error because the entire surgery was administratively accepted. (Doc. 108 at 2). Plaintiffs allege that because Dr. Gendy "did not review the complete records on this issue," his "opinion" is based on inaccurate foundation. (Doc. 108 at 2). Defendants respond that Plaintiffs misconstrued Dr. Gendy's report because he "did not give a legal opinion as to what was administratively required, and he does not offer an opinion on the scope of the ALJ ruling." (Doc. 111 at 8).

In the Court's view, Dr. Gendy's factual summary regarding which treatments were or were not administratively accepted is not a matter of opinion—it is a statement of fact

as to what Dr. Gendy believes were authorized treatments. If his statement incorrectly characterizes which treatments were administratively accepted, Plaintiffs may address this issue through cross examination at trial. In any event, it is unclear how this fact has any bearing on the opinions expressed in Dr. Gendy's report. The Court will deny Plaintiffs' motion to limit or preclude Dr. Gendy's testimony.

### 2. Dr. Zoltan

Defendants categorized Dr. Zoltan as a non-retained medical expert and is closed his testimony as follows:

> Independent medical evaluation provider for Plaintiff, Donald Walker. Dr Zoltan is not retained for this litigation but performed an examination of Donald Walker in the underlying administrative claim. His reports have been previously produced in discovery and are incorporated herein by reference. Dr. Zoltan is expected to testify as a fact and expert witness regarding the facts and circumstances related to his Independent Medical Examinations of Donald Walker, recommendations made for ongoing care of Plaintiff and whether his recommendations for the care of Plaintiff were provided/sought. Dr. Zoltan is also expected to testify concerning his interactions with the relevant parties, relevant records, his qualifications and records he has or will review. Dr. Zoltan's records have been previously produced. Dr. Zoltan will provide opinions that are consistent with and contained in his reports. **He will opine that any delay in surgery or continued/increased pain did not cause any additional damage or impairment.** Dr. Zoltan will address, respond to, and rebut any opinions that any Defendants' conduct exacerbated Plaintiff's condition or caused a separate impairment or damage.

(Doc. 108-8 at 32) (emphasis added). Plaintiffs argue that Defendants: (1) improperly disclosed Dr. Zoltan as a non-retained expert, and (2) disclosed no basis for Dr. Zoltan's opinion that "any delay in surgery or continued/increased pain did not cause any additional damage or impairment." (Doc. 108 at 2, 5) (bolded above). Plaintiffs claim that Dr. Zoltan's evaluations opined on whether Mr. Walker's shoulder symptomology was related to his industrial injury and required surgery, but "ha[d] nothing to do with the presence or absence of negative effects from surgical delay." (Doc. 108 at 5–6; Doc. 117 at 6). Plaintiffs argue that by disclosing this "new" opinion, Dr. Zoltan became a retained expert subject to the reporting requirements under Rule 26(a)(2)(B). (Doc. 108 at 5–6). In response, Defendants assert that Dr. Zoltan's reports *do* address whether Mr. Walker suffered permanent harm from Defendants' conduct. (Doc. 111 at 10). Defendants reference Dr. Zoltan's May 2022

1   report, in which he opined that Mr. Walker was stationary and needed no further medical

2   treatment. (Doc. 111 at 10). In reply, Plaintiffs point out that "Dr. Steingart's opinion about

3   [Mr. Walker's condition] worsening [because of the surgical delay] is based on the delay

4   after May 2022, until surgery in November 2023." (Doc. 117 at 7). Because Dr. Zoltan last

5   saw Mr. Walker for a medical examination in May 2022, Plaintiffs contend that Dr. Zoltan

6   lacks foundation to opine about whether the delay in surgery between May 2022 and

7   November 2023 worsened Mr. Walker's condition. (Doc. 117 at 7).[1]

8        Plaintiffs' point is well-taken—the scope of Dr. Zoltan's disclosure is unclear

9   because it does not indicate what "any delay in surgery" means. Plaintiffs' retained medical

10  expert, Dr. Steingart, opines that "[t]he [surgical] delay between May 2022 and November

11  2023 did have a negative impact" on Mr. Walker's ultimate outcome from surgery. (Doc.

12  104-1 at 24). The Court presumes that Dr. Zoltan is offered to rebut that opinion. But, as

13  Plaintiffs note, Dr. Zoltan has not evaluated Mr. Walker since May 2022. And, critically,

14  unlike Dr. Steingart, Dr. Zoltan was not categorized as a retained medical expert in this

15  bad faith action. Any opinion regarding the causal relationship between (a) the 18-month

16  surgical delay between May 2022 and November 2023, and (b) Mr. Walker's ultimate

17  impairment, goes beyond Dr. Zoltan's opinions developed from his own observations of

18  and interactions with Plaintiff during the two independent medical examinations he

19  _____

20  [1]    Plaintiffs argue for the first time in their reply brief that the opinions in Dr. Zoltan's
    May 2022 IME report should be barred from the current action under res judicata

21  principles. (Doc. 117 at 6–7). Defendants moved to file a sur-reply to Plaintiffs' res judicata
    argument. (Doc. 124). Because Plaintiffs did not raise this argument in their initial motion,

22  the Court will not address it. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The
    district court need not consider arguments raised for the first time in a reply brief.").

23  Accordingly, Defendants' Motion for Leave for File a Sur-Reply to respond to this
    argument is denied as moot.

24      Plaintiffs' reply brief also raises a general challenge to Dr. Zoltan's disclosure,
    alleging that it is inadequate under Rule 26(a)(2)(C) because it "discloses subject matter

25  topics only," but does not properly summarize the facts and opinions Defendants intend to
    elicit from Dr. Zoltan. (Doc. 117 at 7–8). Plaintiffs could have challenged the adequacy of

26  Dr. Zoltan's disclosure under Rule 26(a)(2)(C) in their initial motion, but did not do so.
    Because arguments raised for the first time in reply are waived, *Aguilar v. Peters*, No. CV-

27  23-00268-TUC (SHR), 2024 WL 4870496, at *13 (D. Ariz. Nov. 22, 2024), the Court will
    not address whether Dr. Zoltan's disclosure complied with Rule 26(a)(2)(C) at this time.

28  Indeed, as discussed *infra*, there may be an open question as to whether an IME doctor can
    properly be categorized as a non-retained expert, or if he must be categorized as a retained
    expert and comply with Rule 26(a)(2)(B)'s disclosure requirements.

performed. Accordingly, such an opinion is expert testimony, which would require disclosure of an expert report under Rule 26(a)(2)(B).

Even if Defendants were to argue that "any delay in surgery" encompasses a period during Dr. Zoltan's treatment of Mr. Walker—that is, sometime between his first IME in October 2021 and his second IME in May 2022—the Court would still preclude any opinion on the delay because Dr. Zoltan's disclosure provided no factual basis for it. The disclosure does not explain *why* a "delay in surgery or continued/increased pain" did not impair Mr. Walker further. Disclosing a conclusory opinion without factual support violates Rule 26(a)(2)(C) and is inadmissible.

The Court will grant Plaintiffs' motion to preclude Dr. Zoltan's opinion that "any delay in surgery or continued/increased pain did not cause any additional damage or impairment." By precluding Dr. Zoltan's opinion about the delay, the Court has accepted Plaintiff's conclusion that the issue of whether an IME doctor can ever be a non-retained expert is moot. (Doc. 108 at 5) ("Dr. Zoltan's evaluations and opinions in the underlying workers' compensation case have nothing to do with the presence or absence of negative effects from surgical delay. *The question of whether an underlying IME physician may be a non-retained expert, under Rule 26(a)(2)(C), is mooted by this fact*.") (emphasis added). In other words, the Court is not deciding at this time whether retaining an IME doctor in a workers' compensation proceeding could, by definition, make that doctor a "retained expert" in a bad faith action.

### 3. Non-Retained Experts

Plaintiffs move to preclude several of Defendants' non-retained experts, contending that many of the disclosed witnesses provided factually deficient opinions or opinions amounting to impermissible legal conclusions. (Doc. 108 at 6). Plaintiffs identity two categories of non-retained experts, which the Court addresses in turn.

#### a. Non-Retained Claims-Handling Experts

Plaintiffs challenge Defendants' disclosure of 13 non-retained expert witnesses who were involved in adjusting Mr. Walker's claim. Plaintiffs allege that this list of non-

retained experts "appear[s] to include everyone who ever touched the file," and argue the witnesses should be precluded because there is no factual basis for any of the proffered opinions. (Doc. 108 at 7–8). Defendants respond that they thoroughly disclosed the non-retained expert witnesses in compliance with Rule 26(a)(2)(C). (Doc. 111 at 16).

Defendants disclosed the 13 non-retained claims-handling experts in a singular disclosure as follows:

> Shylondia Peters
> Donna Anselmo
> Elizabeth Taylor
> Yolanda Morales
> Rita Mendivil
> Cindy Scholla
> Paul Burk
> Herman Ramirez
> George Gonzales
> Michele Berrington
> Heather Baker
> Kamau Ngozi
> Paula Baughman

> These individuals are non-retained expert witnesses. These individuals are or were at the time of the events in question, employees of Gallagher. These individuals do not engage in litigation as part of their employment; it is not a condition or part of their employment to regularly engage in providing testimony. It is anticipated each will testify as to the knowledge and information he or she possess regarding the events made the basis of this pending cause of action.

> At the times relevant hereto, these individuals were employees of Gallagher Bassett Services, Inc., and/or representatives of the Carrier Defendant and are expected to testify concerning their involvement with the handling of Plaintiffs (Donald Walker) underlying workers' compensation claim arising out of the alleged on-the-job injury. They will testify as to the reasonableness of the actions of the Defendants and that the claim was handled consistent with industry practice, standards and the laws of Arizona. They are also expected to testify concerning their knowledge of claims for workers' compensation benefits or (Donald Walker) denials of workers' compensation benefits to Plaintiff. They will address the fact Donald Walker's claim was fairly debatable, the standard for compensability at the administrative level, the fact the applicant/Plaintiff had the burden of proof to establish the claim was work related, that Defendants reasonably relied on IME providers, and that indemnity benefits were timely and appropriately paid consistent with the Arizona Workers' Compensation Act based on the information provided by Donald Walker. Each will testify as to any claim note entries or activities in which they were involved and that the claim was handled appropriately in accordance with best practices, industry standards and applicable law.

These witnesses will testify that the Arizona Workers' Compensation Act permits an investigation to continue even after a denial is filed. It is not bad faith or a violation of the Arizona Workers' Compensation Act to continue to maintain a denial pending an investigation. Continuing an investigation is actually standard industry practice and does not violate basic claims handling standards. These witnesses will testify that the claims handling decisions were not unfounded and the claim file and claim notes demonstrate compliance with the Arizona Workers' Compensation Act, statute, rules, and applicable authority. Provision of workers' compensation benefits does not require that all requested benefits must be paid - an injured worker is only entitled to benefits payable under the Arizona Workers' Compensation Act. These witnesses will testify that Donald Walker's workers' compensation benefits were paid consistent with the Arizona Workers' Compensation Act. These witnesses will testify that there was no delay in issuance of a Notice of Claim Status. These witnesses will testify that their role is to adjust claims pursuant to the Arizona Workers' Compensation Act. Donald Walker hired an attorney to "assist" him in the claim and understanding the benefits available. Once an attorney is hired, the adjuster was prohibited from further direct contact with the applicant/Plaintiff. These witnesses will testify that ICA, not Gallagher, identified the incorrect carrier; regardless, no benefits were delayed due to ICA's inaccurate notification. These witnesses will testify that the claim was handled promptly in accordance with the Arizona Workers' Compensation Act, and any delay in resolution was not unreasonable. These witnesses will testify that Donald Walker's claim did not fall off the adjuster's diary; documentation of Donald Walker's claim was up-to-date based on information provided. Donald Walker himself delayed in providing information to Defendants to ensure timely claim handling and benefit disbursement. These witnesses will testify that they reviewed and considered the medical records while handling the claim and applied the facts of Donald Walker's claim to the law when making claims handling decisions. Defendants and their employees were not biased against Plaintiffs. The claims handling decisions were timely and appropriate. Benefits, including permanent disability benefits, were timely paid based on the information provided to and gathered by Defendants. Defendants did perform an adequate investigation in all aspects of the claim including but not limited to loss of earning capacity. Benefits were promptly paid once they were determined to be payable based on the continuing investigation of Donald Walker's workers' compensation claim. Further, it is not unreasonable to rely on the advice of medical professional, such as Dr. Zoltan, when making claims handling decisions. Defendants had a reasonable basis for their claims handling decisions and the claims handling decisions were consistent with the Arizona Workers' Compensation Act and industry standards for claims handling.

Additionally:

Elizabeth Taylor was deposed and gave opinions in her deposition. Ms. Taylor opines that she and Gallagher did affirm or deny the Plaintiffs workers compensation claim in a timely manner; that she and Gallagher did understand timely payment of workers' compensation benefits; and that she and Gallagher did not misuse investigation as a delay tactic. Ms. Taylor also opines that an investigation need not and usually cannot be completed before a denial is filed. She also testified that Plaintiffs' counsel misconstrues her claim note entries. She did not disagree with Mr. Burke's decisions. Ms. Taylor's complete deposition is incorporated herein by reference.

Shylondia Peters was deposed and gave opinions in her deposition. Ms. Peters opines that she and Gallagher did acknowledge claims handling best practices; that she and Gallagher did understand adjuster responsibilities; and that she and Gallagher did have knowledge about ICA requirements. She opines the claim was properly handled by her. Her deposition is incorporated herein by reference.

Rita Mendivil was deposed and gave opinions in her deposition. Ms. Mendivil opines that she and Gallagher did timely resolve compensability; that she and Gallagher properly used "pending investigation" denials; that she and Gallagher did consider established medical evidence; that she and Gallagher met industry standards; and that she and Gallagher did not have a bias against the Claimant. Ms. Mendivil's deposition is incorporated herein by reference.

(Doc. 108-8 at 30–32).

Under Rule 26(a)(2)(C), the disclosure of a non-retained expert must state the subject matter on which the witness is expected to present evidence and a summary of the facts and opinions to which the witness is expected to testify. "The purpose of the Rule 26(a)(2)(C) requirement is to allow the party in receipt of the disclosure to be able to read the disclosure and immediately be able to identify whether it needs a responsive witness and the information that such responsive witness would need to address." *Cooke v. Town of Colorado City*, No. CV 10-08105-PCT-JAT, 2013 WL 551508, at *4 (D. Ariz. Feb. 13, 2013). In evaluating whether a disclosure comports with Rule 26(a)(2)(C)'s requirements, "[c]ourts must take care against requiring undue detail." *Jones v. Colorado Cas. Ins. Co.*, No. CV-12-01968-PHX-JAT, 2015 WL 6123125, at *3 (D. Ariz. Oct. 19, 2015) (quoting Fed. R. Civ. P. 26 advisory committee note to 2010 amendment).

The Court finds that Defendants' disclosure fails to meet the requirements of Rule 26(a)(2)(C) because it is factually deficient. While the disclosure identifies the non-retained experts as "employees of Gallagher Bassett Services, Inc., and/or representatives of the Carrier Defendant" that were involved in handling Mr. Walker's claim, it makes no mention of the specific work each individual completed in handling the claim. Indeed, the disclosure completely fails to provide *any* individualized information for 10 of the 13 non-retained experts. Defendants apparently expect that all 13 individuals will provide identical testimony and opinions, despite their presumably different roles, levels of involvement,

and knowledge regarding Mr. Walker's claim. This falls woefully short of the required "summary of the facts . . . to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Beyond the complete absence of facts establishing each individual's connection to and role in handling Mr. Walker's claim, Defendants also failed to support the disclosed opinions with any factual basis. For example, all 13 witnesses are disclosed to opine that: (1) "the claims handling decisions were not unfounded and the claim file and claim notes demonstrate compliance with the Arizona Workers' Compensation Act, statute, rules, and applicable authority"; (2) "Donald Walker's workers' compensation benefits were paid consistent with the Arizona Workers' Compensation Act"; (3) "the claim was handled promptly in accordance with the Arizona Workers' Compensation Act, and any delay in resolution was not unreasonable"; (4) "Defendants did perform an adequate investigation in all aspects of the claim including but not limited to loss of earning capacity"; and (5) "[b]enefits, including permanent disability benefits, were timely paid based on the information provided to and gathered by Defendants." (Doc. 108-8 at 31).

These are conclusory statements and opinions wholly unsupported by facts. The disclosure leaves the reader wondering: (1) what the claims handling decisions were based on, and how the file or notes demonstrate legal compliance; (2) what benefits Mr. Walker received, and when; (3) how quickly the claim was processed; (4) what steps Defendants took to investigate the claim; and (5) which benefits were paid, when they were paid, and what information formed the basis for those payments. And while parties need not provide *undue* detail in non-retained expert disclosures, they must provide *some* level of detail. As the Court noted, a summary disclosure pursuant to Rule 26(a)(2)(C) should allow the opposing party to immediately determine whether a responsive witness is required, and, if so, the subject matter that responsive witness would need to address. *Cooke*, 2013 WL 551508, at *4. Without disclosing any factual basis for each witness's opinion, opposing counsel cannot determine whether responsive witnesses are needed to address testimony from some, all, or none of the non-retained claims-handling experts.

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1). This sanction for improper disclosure is automatic and is only excused if the violating party shows "the failure was substantially justified or is harmless." *Id.*; *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012). Here, Defendants make no argument that the failure to comply with Rule 26(a)(2)(C) was justified or harmless. However, the Court notes that Defendants' disclosure provided additional information regarding Elizabeth Taylor, Shylondia Peters, and Rita Mendivil based on statements made in their respective depositions. (Doc. 108-8 at 31–32, Doc. 46, Doc. 47, Doc. 48). Because Plaintiffs deposed these three non-retained experts, the Court finds that permitting their expert testimony is harmless insofar as the testimony is limited to the expert opinions given during those depositions. *Lambert*, 2016 WL 3193252, at *2 (permitting non-retained expert witness testimony despite Rule 26(a)(2)(C) disclosure violations because both witnesses had been deposed, but limiting such testimony to opinions elicited during each witness's respective deposition).

The Court will grant in part and deny in part Plaintiffs' motion to preclude the 13 non-retained claims-handling experts. Elizabeth Taylor, Shylondia Peters, and Rita Mendivil may provide expert testimony consistent with such testimony given in their depositions. The remaining experts (Donna Anselmo, Yolanda Morales, Cindy Scholla, Paul Burk, Herman Ramirez, George Gonzales, Michele Berrington, Heather Baker, Kamau Ngozi, and Paula Baughman) are precluded from providing expert testimony. This Order does not address whether those precluded individuals may testify as fact witnesses.

#### b.  Non-Retained Medical Provider Experts

Plaintiffs also challenge Defendants' disclosure of "multiple medical providers" involved in Mr. Walker's workers' compensation claim. Plaintiffs argue that these witnesses are disclosed to offer opinions beyond the scope of their treatment without any factual basis. (Doc. 108 at 8).

Plaintiffs fail to specify by name which medical providers they wish to preclude

- 15 -

from testifying. They merely direct the Court to "pages 7–8 of [Defendants'] November disclosure and 22–23 of [Defendants'] February disclosure." (Doc. 108 at 8). Pages 7 and 8 of Defendants' November disclosure list: Steven Baker, Dr. Steingart, Dr. Gruber, Steven Ortaldo, David Miranda, Rebecca Reaser, Anthony Nelson, Janice Johnston, and Lauren King. (Doc. 108-8 at 8–9).[2] Pages 22 and 23 of Defendants' February disclosure list the same individuals, as well as Dr. Zoltan.[3] (Doc. 108-8 at 32–34).

Because Dr. Steingart is Plaintiffs' own retained expert witness, the Court assumes that Plaintiffs do not wish to preclude his testimony. Defendants provided essentially identical disclosures for each non-retained medical provider expert as follows:

### Dr. Brian Gruber, MD

Medical provider for Plaintiff, Donald Walker. Dr. Gruber is expected to testify regarding the facts and circumstances related to his examination and care of Plaintiff, recommendations made for ongoing care of Plaintiff and whether his recommendations for the care of Plaintiff were provided/sought. Dr. Gruber is also expected to testify concerning his interactions with the relevant parties. Plaintiff has not sustained any impairment due to any conduct of any defendant. Dr. Gruber's records have been provided in discovery and he may testify as to the content of those records.

(Doc. 108-8 at 33).

### Stephen Ortaldo, M.D.

Medical provider for Plaintiff, Donald Walker. Dr. Ortaldo is expected to testify regarding the facts and circumstances related to his examination and care of Plaintiff, recommendations made for ongoing care of Plaintiff and whether his recommendations for the care of Plaintiff were provided/sought. Dr. Ortaldo is also expected to testify concerning his interactions with the relevant parties. Plaintiff has not sustained any impairment due to any conduct of any defendant. Dr. Ortaldo's records have been provided in discovery and he may testify as to the content of those records.

(Doc. 108-8 at 33).

---

[2] Steven Baker is a workers' compensation attorney disclosed to refute any factual testimony of Mr. Sarkisov (Mr. Walker's workers' compensation attorney from the underlying ICA proceedings). Plaintiffs assert that Defendants improperly disclosed Mr. Baker as a non-retained expert witness because he will only be testifying as a fact witness. However, because Plaintiffs do not contest the substance of his testimony, the Court will not further analyze this witness.

[3] The Court separately addressed Plaintiffs' challenges to Dr. Zoltan above.

1

David Miranda

2

Medical provider for Plaintiff, Donald Walker. Mr. Miranda is expected to
testify regarding the facts and circumstances related to his examination and
care of Plaintiff, recommendations made for ongoing care of Plaintiff and
whether his recommendations for the care of Plaintiff were provided/sought.
Mr. Miranda is also expected to testify concerning his interactions with the
relevant parties. Plaintiff has not sustained any impairment due to any
conduct of any defendant. Mr. Miranda's records have been provided in
discovery and he may testify as to the content of those records.

3

4

5

6

7

(Doc. 108-8 at 33).

8

Rebecca Reaser

9

Defendants' consultant. Ms. Reaser is expected to testify regarding the facts
and circumstances related to her knowledge of the vocational opportunities
available to Plaintiff, including the care and treatment received by Plaintiff,
recommendations made by medical providers for ongoing care, and whether
or not such recommendations were provided/sought. She is also expected to
testify regarding her interactions with the relevant parties. Plaintiff has not
sustained any impairment due to any conduct of any defendant. Her reports
have been provided to Plaintiff and are incorporated herein by reference.

10

11

12

13

14

(Doc. 108-8 at 34).

15

Anthony Nelson, P A-C
Janice Johnston, MD
Lauren King, NO

16

17

Medical provider for Plaintiff, Donald Walker. The witness is expected to
testify regarding the facts and circumstances related to his or her examination
and care of Plaintiff, recommendations made for ongoing care of Plaintiff
and whether those recommendations for the care of Plaintiff were
provided/sought. The witness is also expected to testify concerning his or her
interactions with the relevant parties. Plaintiff has not sustained any
impairment due to any conduct of any Defendant. Arrow Head Health
Center's records have been provided in discovery and the witness may testify
as to the content of those records.

18

19

20

21

22

(Doc. 108-8 at 34).

23

The disclosure of a non-retained expert under Rule 26(a)(2)(C) must state the

24

subject matter on which the witness is expected to present evidence and a summary of the

25

facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C).

26

Although courts are cautioned against "requiring undue detail" in such disclosures, the

27

disclosure must be sufficiently detailed to allow the opposing party to "immediately . . .

28

identify whether it needs a responsive witness and the information that such responsive

1
2
3
4
5
6
7
8

witnesses would need to address." Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment; *Cooke*, 2013 WL 551508, at *4. A Rule 26(a)(2)(C) disclosure must do more than merely "state that the witness will testify consistent with information contained in the medical records." *Jones*, 2015 WL 6123125, at *3 (quoting *Hayes v. Am. Credit Acceptance, LLC*, No. 13-2413-RDR, 2014 WL 3927277, at *3 (D. Kan. Aug. 12, 2014)). "Instead, the disclosure must 'summarize actual and specific opinions' and, if the physician is to opine on causation, explain 'how' and 'why' the physician reached a particular opinion." *Id.*

9
10
11
12
13
14
15
16
17
18
19
20
21

The Court finds that Defendants' disclosures do not comply with Rule 26(a)(2)(C)'s requirements. The disclosures vaguely state that each witness will testify regarding: (1) "the facts and circumstances related to his or her examination and care of Plaintiff, recommendations made for ongoing care of Plaintiff and whether those recommendations for the care of Plaintiff were provided/sought," and (2) "[the witness's] interactions with the relevant parties."[4] This is an insufficient "summary of the facts" of each witness's expected testimony. It does not provide the reader *any* detail about the witness's observations from examining Mr. Walker, the care each witness provided Mr. Walker, *what* each witness ultimately recommended for Mr. Walker's ongoing care, *who* the "relevant parties" are, or the facts of the interaction(s) with such parties. Defendants' merely note that each witness's records "have been provided in discovery" and that the witnesses "may testify as to the content of those records." This Court has found that such statements are not enough to fulfill Rule 26(a)(2)(C)'s requirements. *Jones*, 2015 WL

22
23
24
25
26
27
28

---

[4] The Court notes that Rebecca Reaser's disclosure differs slightly from the disclosures of the medical provider witnesses. Defendants' Rule 26(a) disclosures state that Ms. Reaser is a consultant with information on Mr. Walker's loss of earning capacity, "available jobs[,] and amounts payable under workers' compensation." (Doc. 108-8 at 15). The non-retained expert disclosure states that Ms. Reaser is expected to testify "regarding the facts and circumstances related to her knowledge of the vocational opportunities available to Plaintiff, including the care and treatment received by Plaintiff, recommendations made by medical providers for ongoing care, and whether or not such recommendations were provided/sought." Although the language is not identical to the other disclosures, it is similarly inadequate under Rule 26(a)(2)(C). It does not inform the reader *what* vocational opportunities were available to Mr. Walker, or *which* details of Mr. Walker's care and treatment Ms. Reaser will testify about. Because the disclosure fails to summarize the facts of Ms. Reaser's expected testimony, it violates Rule 26(a)(2)(C).

6123125, at *3.

And the singular opinion in each disclosure—i.e., "Plaintiff has not sustained any impairment due to any conduct of any defendant"— is wholly devoid of any explanation regarding "how" or "why" each witness formed such an opinion, which further violates Rule 26(a)(2)(C). *O'Daniel v. Arizona Hay & Feed LLC*, No. CV-20-02224-PHX-ESW, 2022 WL 1443764, at *4 (D. Ariz. May 6, 2022) (finding non-retained expert disclosures were insufficient because Plaintiff failed to disclose the "factual bases for 'how' or 'why' the non-retained experts formed their opinions").

Because Defendants' disclosures do not comply with Rule 26(a)(2)(C), Defendants are barred from eliciting expert testimony from its non-retained medical provider witnesses unless Defendants can demonstrate that its inadequate disclosure was substantially justified or harmless. Ariz. R. Civ. P. 37(c)(1); *R & R Sails Inc.*, 673 F.3d at 1246 ("The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."). Defendants failed to argue the inadequate disclosure was excusable under either ground, and thus did not satisfy its burden.

The Court will grant Plaintiffs' motion to preclude the following witnesses from giving expert testimony: Dr. Brian Gruber, Stephen Ortaldo, David Miranda, Rebecca Reaser, Anthony Nelson, Janice Johnston, and Lauren King. This Order does not address whether the non-retained experts may testify as fact witnesses.

### 4. John Beringer[5]

Defendants retained Mr. Beringer to provide expert testimony regarding workers'

---

[5] Plaintiffs also move to preclude multiple non-retained experts. (Doc. 107 at 14). These are the same non-retained experts that Plaintiffs challenged in their motion to preclude Dr. Gendy and Dr. Zoltan's testimony. (Doc. 108). Because the Court already ruled on Plaintiffs' motion to preclude these witnesses, the Court will not re-address Plaintiffs' duplicative challenge here.

Plaintiffs also allege that Defendants' disclosure of Steve Baker violates Rule 26(a)(2)(C)'s disclosure requirements. (Doc. 107 at 14). This argument conflicts with Plaintiffs' motion to preclude Dr. Gendy and Dr. Zoltan's testimony. (Doc. 108). In that motion, Plaintiffs acknowledged that Mr. Baker was disclosed as a non-retained expert witness, and noted that "Defendants seem to take pains to limit [his] testimony to factual observations only. But then he should not be listed as a non-retained expert." (Doc. 108 at 8). Due to the conflicting nature of Plaintiffs' arguments regarding Mr. Baker, the Court will not address them.

compensation claims practices. Mr. Beringer's report begins by briefly recounting the key facts of the case; he then describes the standard of care applied to workers' compensation claims generally. (Doc. 107-1 at 2–3). With respect to Mr. Walker's case, Mr. Beringer opined:

> In this specific case, the documentation provided demonstrates the active involvement of the claim administrator, the timely challenge of disputed information, and a timely attempt to resolve the difference of opinion. The actions of the Claim Administrator, including the handling adjusters, were reasonable for the situation, and well within the standard of care associated with these duties.
>
> Further, the supervision of regulatory duties associated with licensed insurance carrier's oversight of the Third-Party Administrator were proper was well.

(Doc. 107-1 at 3).

Plaintiffs do not challenge Mr. Beringer's qualifications. Nor do they challenge Mr. Beringer's opinions regarding the general standards of care applied to workers' compensation claims. Instead, Plaintiffs challenge Mr. Beringer's opinion that Defendants' actions "were reasonable for the situation." (Doc. 107 at 8). Plaintiffs argue that Mr. Beringer violated the disclosure requirements under Rule 26(a)(2)(B)(i) because he does not disclose the basis and reasons for his opinion.  (Doc. 107 at 9). They further contend that while Mr. Beringer summarizes some of the documents he reviewed in authoring his report—the complaint, motions for summary judgment, and certain claim notes—he failed to connect the dots between Defendants' conduct and the accepted industry standards for good faith claims handling. (Doc. 107 at 11).  Plaintiffs argue that, without an explanation as to how the "reported material impacts allegations of bad faith," the Court cannot evaluate the reliability of Mr. Beringer's testimony. (Doc. 107 at 11). Plaintiffs also criticize the scope of Mr. Beringer's review, alleging that he formed his opinion without (1) reviewing the depositions of certain claims handling personal, Plaintiffs' claims handling expert, Dr. Steingart, and Mr. Sarkisov, or (2) analyzing "critical facts" of the case. (Doc. 107 at 12).

Defendants respond that Mr. Beringer's report details his opinions and the facts forming the basis of those opinions in compliance with Rule 26(a)(2)(B). (Doc. 112 at 2).

1    Defendants claim Mr. Beringer is "imminently qualified" to render opinions based on his

2    fifty-five years in the insurance industry (Doc. 112 at 9), and that Plaintiffs' complaints go

3    primarily to the weight of his testimony, not its admissibility. (Doc. 112 at 10).

4                                    a.  Reliability

5            The Court begins by addressing Plaintiffs' criticisms regarding the reliability of Mr.

6    Beringer's testimony. "In considering the admissibility of [non-scientific] testimony based

7    on some 'other specialized knowledge,' Rule 702 generally is construed liberally." *United

8    States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Given the non-scientific nature of

9    Mr. Beringer's testimony, "[t]he *Daubert* factors (peer review, publication, potential error

10   rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends

11   heavily on the knowledge and experience of the expert, rather than the methodology or

12   theory behind it." *Id.*; *see also Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998,

13   1017–18 (9th Cir. 2004) (noting the reliability of an expert testifying about claims

14   adjustment standards in the context of an insurance bad faith claim "was not contingent

15   upon a particular methodology or technical framework," and affirming the district court's

16   conclusion that the expert's experience, training, and education provided a sufficient

17   foundation of reliability for his testimony).

18          The Court is satisfied that Mr. Beringer possesses the requisite knowledge and

19   experience to render his opinions reliable. Mr. Beringer has worked in the insurance

20   industry since 1969 in various capacities, including as an adjuster, a litigation claims

21   manager, and a private practitioner providing insurance coverage and claims handling

22   analysis the insurance industry. (Doc. 112 at 1, Doc. 112-3). He has also provided expert

23   and consulting services in other workers' compensation matters. (Doc. 112-3 at 2).

24   Plaintiffs do not dispute Mr. Beringer's knowledge or experience.

25   To the extent that a non-scientific claims handling expert employs a certain "methodology"

26   in forming his opinion, Mr. Beringer used the same methodology as Plaintiffs' claims

27   handling expert. He reviewed documents from the present action and the underlying

28   workers' compensation case and based on that review, opined as to whether Defendants'

1   conduct aligned with industry standards. *See Liberty Life Ins. Co. v. Myers*, No. CV 10-
2   2024-PHX-JAT, 2013 WL 524587, at *6 (D. Ariz. Feb. 11, 2013*) (finding that a life-
3   insurance claims expert's methodology met *Daubert*'s standard for reliability because he
4   came to his conclusions by "looking at how the claim was filed" and "consider[ing] the
5   steps the insurance company . . . took in processing the claim").

6       Plaintiffs' complaints about *which* documents comprised Mr. Beringer's review go
7   to the weight, not the admissibility, of his testimony. The mere fact that Mr. Beringer did
8   not review the same materials as Plaintiffs' claims handling expert does not render him
9   unreliable and mandate preclusion. *See In re Bard IVC Filters Products Liab. Litig.*, No.
10  MDL 15-02641-PHX-DGC, 2018 WL 993675, at *3 (D. Ariz. Feb. 21, 2018) (rejecting
11  plaintiffs' argument that defendants' expert's opinions were "unreliable because he did not
12  review . . . documents on which [p]laintiffs' experts relied" and noting that criticisms about
13  the scope of the expert's review were "fair game for trial"). Criticism regarding the breadth
14  of Mr. Beringer's record review is an appropriate issue for cross examination at trial. *Id.*;
15  *see also Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (noting that
16  "the relative weakness or strength of the factual underpinnings of the expert's opinion goes
17  to weight and credibility, rather than admissibility," and may be developed upon cross-
18  examination).

19                      b.  Rule 26(a)(2)(B) Compliance

20      The Court next addresses Plaintiffs argument that Mr. Beringer's report violates
21  Rule 26(a)(2)(B). A retained expert report must contain, among other things, "a complete
22  statement of all opinions the witness will express and the basis and reasons for them." Fed.
23  R. Civ. P. 26(a)(2)(B)(i). As the Court noted above, Mr. Beringer opines that:

24          [T]he documentation provided demonstrates the active involvement of the
25          claim administrator, the timely challenge of disputed information, and a
            timely attempt to resolve the difference of opinion. The actions of the Claim
26          Administrator, including the handling adjusters, were reasonable for the
            situation, and well within the standard of care associated with these duties.

27  (Doc. 107-1 at 3). Plaintiffs contend that Mr. Beringer's opinion does not provide the
28  required "basis and reasons" for his opinion. We agree with Plaintiffs that Mr. Beringer's

report is sorely lacking in detail to support his opinion. The "Commentary and Conclusion" portion of his report does not reference which documents he reviewed, elaborate on specific details of the claims handling process, or provide particularized analysis about any claims-handling decisions.

However, there is at least some reference, however vague, to the basis and reasons supporting his opinion that Defendants acted reasonably in adjusting Mr. Walker's claim. Mr. Beringer notes that he formed his opinion based on "the documentation provided." The documentation apparently showed that Defendants were actively involved in the administration of the claim, presented timely challenges to disputed information, and attempted to resolve differences of opinion in a timely manner. While the provided basis and reasoning lack specificity, the Court finds that Mr. Beringer's report provides enough detail to avoid wholesale preclusion. But Court finds that imposing a limitation on Mr. Beringer's testimony is appropriate, given the vagueness of his report.

Accordingly, Mr. Beringer may testify at trial, but his testimony will be limited to the opinions and details contained in his report. For instance, he could permissibly testify that the documentation he reviewed showed the claim administrator was actively involved in the claims-handling process. But he cannot provide additional information or analysis to bolster that opinion because his report was devoid of such details. The Court finds that this strikes an appropriate balance: it avoids the harsh sanction of excluding Mr. Beringer's testimony entirely, while also preventing him from providing analysis that was not disclosed in his expert report.[6]

## C. Conclusion

For the stated reasons, the Court will grant in part and deny in part Plaintiffs' Motion to Exclude Testimony from Dr. Gendy and Dr. Zoltan. (Doc. 108). The Court will grant in

---

[6] Defendants also argue that their expert disclosure "meet[s] every requirement of Rule 26(a)(2)(B)," and proceed to quote the entirety of Mr. Beringer's disclosure. (Doc. 112 at 4–6, Doc. 107-11 at 3–5). However, this argument overlooks the distinction between an attorney's duty to disclose expert witnesses under Rule 26(a)(2)(A) and a retained expert's obligation to provide a report under Rule 26(a)(2)(B). An attorney's disclosure of an expert witness is not a substitute for the expert's independent responsibility to produce a report that states the basis and reasons for the expert's opinions. Again, Mr. Beringer will be limited to the contents of his expert report.

part and deny in part Plaintiffs' motion to exclude testimony from Defendants' non-retained expert witnesses. (Doc. 108). The Court will deny Plaintiffs' Motion to Exclude Expert Testimony from Mr. Beringer. (Doc. 107).

## IV.    DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY

Defendants jointly filed three motions to limit or exclude expert testimony. (Doc. 102, 103, 104). The motions are fully briefed. (Doc. 113, 118, 110, 115, 109, 114).

### A.  Legal Standard

As discussed above, under Rule 702, an expert may testify based on "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The proponent of expert testimony has the ultimate burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under Rule 702. *See Lust by & Through Lust v. Merrell Dow Pharm.*, 89 F.3d 594, 598 (9th Cir. 1996). The trial court acts as a gatekeeper to assure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Rule 702's requirements and the Court's gatekeeping role apply to all expert testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

### B.  Discussion

Defendants move to exclude testimony from Elliot Flood and George Sarkisov. (Doc. 102, 103). Defendants also move to limit testimony from Dr. Michael Steingart. (Doc. 104). The Court addresses each in turn.

#### 1.  Elliot Flood

Plaintiffs retained Mr. Flood to provide expert testimony regarding insurance industry customs and standards and opine on whether Defendants adhered to those standards in handling Mr. Walker's workers' compensation claim. (Doc. 102-2 at 3). Defendants move to strike his testimony on multiple grounds, which are detailed below.

a.  Qualifications

Defendants challenge Mr. Flood's qualifications because he "has never held an Arizona adjuster's license," "has not actually been involved in claims handling for years," and "has never personally adjusted an Arizona workers' compensation claim." (Doc. 102 at 1–2, 12). In response, Plaintiffs emphasize that Mr. Flood has worked in insurance-related fields since 1982 as an insurance defense attorney, a vice president and general auditor at Texas Mutual Insurance Company, and a private insurance consultant. (Doc. 113 at 3). While at Texas Mutual, Mr. Flood investigated complex or unusual claims, trained insurance adjusters, and taught insurance customs and practices to other employees. (Doc. 113 at 3). In his capacity as a private insurance consultant, Mr. Flood has worked on workers' compensation claims in Arizona. (Doc. 113 at 4).

The Court is satisfied that Mr. Flood possesses "a minimal foundation of knowledge, skill, and experience" regarding insurance industry customs and practices based on his decades of experience in the field. *Hangarter*, 373 F.3d at 1016. Thus, he is qualified.

b.  Reliability

Defendants argue that Mr. Flood's opinion is unreliable. Although it is unclear from Defendants' initial motion which portions of Mr. Flood's opinion they argue are unreliable, the reply clarifies that two of Mr. Flood's opinions "are contrary to the Arizona Workers' Compensation Act and the facts of this case." (Doc. 118 at 8). Because these opinions allegedly contradict the law, Defendants argue they are unreliable and should be stricken. (Doc. 118 at 9).

Mr. Flood is an expert on insurance industry customs, practices, and standards. If he is incorrect about the law or misstated the case facts, that goes to the weight assigned to his testimony, not its admissibility. *McCalla v. ACE Am. Ins. Co.*, No. CV-20-01561-PHX-JAT, 2022 WL 2290552, at *9 (D. Ariz. June 24, 2022).

c.  Relevance

Defendants argue that Mr. Flood's opinions "regarding the role of an adjuster, third

1  party administrator and workers' compensation carrier" are not relevant or helpful in

2  assisting the trier-of-fact with its duties. (Doc. 102 at 4). Defendants contend that because

3  "a jury will be asked to address the reasonableness of Defendants' conduct, having

4  conflicting expert testimony on reasonableness would only serve to confuse and mislead

5  the jurors who are perfectly capable of assessing reasonableness themselves."[7] (Doc. 102

6  at 11–12). Defendants argue "Mr. Flood should be precluded from testifying to his opinion

7  that Defendants committed bad faith." (Doc. 102 at 6). Plaintiffs respond that lay jurors are

8  unaware of what is required to adjust an insurance claim, and that Mr. Flood's testimony

9  will help explain the training and industry standards necessary for good faith claim

10  handling. (Doc. 113 at 5). Plaintiffs claim that Mr. Flood's report does not state Defendants

11  committed bad faith. (Doc. 113 at 15).

12  Federal Rule of Evidence 702's requirement that expert testimony "assist the trier

13  of fact" "goes primarily to relevance." *Daubert I*, 509 U.S. at 580. Expert testimony is

14  relevant if it assists the trier of fact in understanding evidence or in determining a fact in

15  issue. *Id.* at 591; *see also McKendall v. Crown Control Corp.*, 122 F.3d 803, 807 (9th Cir.

16  1997).

17  Defendants note that the "ultimate legal issue" here is whether Defendants engaged

18  in bad faith in adjusting Mr. Walker's claim. (Doc. 102 at 6). Hearing testimony as to

19  whether Defendants' conduct aligned with or departed from industry standards will aid the

20  trier of fact in making this determination. The Court finds Mr. Flood is a relevant expert

21  witness.

22  ### d. Legal Opinions

23  Defendants argue Mr. Flood's opinion "that Defendants' conduct was unreasonable

---

[7] The Court notes that Defendants' own claims handling expert, John Beringer, opined that "[t]he actions of the Claim Administrator, including by the handling adjusters, were **reasonable for the situation**, and well within the standard of care associated with these duties." (Doc. 107-1 at 3) (emphasis added). In opposing Plaintiffs' motion to preclude Mr. Beringer's testimony, Defendants argue that Mr. Beringer's report opining on Defendants' "reasonable" conduct satisfies Rule 26(a)(2)(B). (Doc. 112 at 2). Defendants cannot have it both ways: they cannot argue Mr. Flood should be barred from offering an opinion on the reasonableness of Defendants' conduct because that determination is for the jury, while simultaneously presenting their own expert's opinion that the same conduct was reasonable. The Court will not address this argument.

and fell below industry standards" is a conclusory legal opinion lacking foundation. (Doc. 102 at 8). Specifically, Defendants take issue with Mr. Flood's opinions that: (a) Defendants improperly relied on Dr. Zoltan's second IME report in denying surgery, and (b) Mr. Walker's "indemnity benefits were delayed without justification." (Doc. 102 at 7). Defendants: (a) assert that relying on Dr. Zoltan's IME report conformed with the Arizona Workers' Compensation Act, and (b) offer a host of details to explain why the delay in paying indemnity benefits was justified. (Doc. 102 at 7). Because Mr. Flood's opinions "direct[ly] conflict with Arizona law" and lack foundation, Defendants argue they should be precluded. (Doc. 102 at 7–8).

An expert witness cannot opine on an ultimate issue of law, *Nationwide Transport Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008), but "may address the factual question of whether an insurer deviated from the customs, practices, and standards of the insurance industry," *Finkelstein v. Prudential Fin. Inc.*, No. CV-21-00657-PHX-MTL, 2023 WL 6970280, at *15 (D. Ariz. Oct. 23, 2023).

Mr. Flood opined that Defendants' reliance on Dr. Zoltan's second IME report "was a clear deviation from industry standards of fair claims handling." (Doc. 102-2 at 25). He also opined that the "handling of Mr. Walker's estimated permanent disability benefits fell far short of industry standards." (Doc. 102-2 at 38). These are not legal conclusions "on [] ultimate issue[s] of law." Although these opinions may support a finding that Defendants acted in bad faith, Mr. Flood does not conclude Defendants actually engaged in bad faith. *Hangarter*, 373 F.3d at 1016. Because Mr. Flood does not "improperly embrace the issue of bad faith," Defendants' challenge to his opinions are without merit. *Id.*

To the extent that Defendants mean to argue that Mr. Flood "may testify to matters of law or interpret the law to the jury" in violation of Federal Rule of Evidence 704, the Court disagrees. While Mr. Flood's report does reference various provisions of Arizona's Workers' Compensation Act to support his opinion that Defendants deviated from the Act's requirements, the Ninth Circuit has held "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Id.* at 1017

1    (concluding that witness's reference to state statutory provisions which were not "directly

2    at issue" were "ancillary to the ultimate issue of bad faith"). *Id.*

3                          e.    State-of-Mind Opinions

4           Defendants contend that Mr. Flood impermissibly opined on Defendants' and their

5    employees' state of mind. (Doc. 102 at 8). Defendants point the Court to 31 statements

6    from Mr. Flood's report that allegedly constitute state-of-mind opinions:

7                  (1) "Any reasonable insurer would have known that Dr. Zoltan's
8           second Independent Medical Examination (IME) report from 5/18/22 was
            deficient . . .";

9                  (2) "Any reasonable insurer would recognize the need to consider
10          ongoing treatment and progress when assessing the compensability of the
            injury rather than disregarding it based on an unexplained change in medical
11          opinion;"

12                 (3) "A reasonable insurer would require more than a contradictory
            statement to deny continued treatment;"

13                 (4) "For an insurer to suddenly question the compensability after this
14          concession [of compensability], based on the second IME's unfounded
            reversal, is unreasonable;

15                 (5) "Rather than investigate these critiques [of the second IME],
16          Gallagher Bassett simply abandoned the claim to the litigation process;"

17                 (6) "A reasonable insurer would have recognized the likelihood of the
            ICA endorsing the second IME report was extremely low. Given the clear
18          medical evidence already provided by Dr. Steingart and Dr. Zoltan's original
            findings, it would have been apparent that the second IME's reversal was
19          inconsistent and unsupported by new evidence. Pursuing an ICA hearing to
            dispute the compensation of the shoulder based on the second IME was
20          unreasonable and a wasteful delay tactic, causing unnecessary expense and
            prolonging Mr. Walker's suffering. Understanding the weight of evidence
21          and the ICA's likely stance, a reasonable insurer would have avoided
            pursuing a hearing and instead continued with appropriate treatment for the
22          shoulder injury;"

23                 (7) Any reasonable insurer would recognize the inconsistencies in Dr.
            Zoltan's second IME report, especially in comparison to his first report,
24          which had led to the initial concession of the claim. Without new evidence
            or valid reasoning for the reversal, Gallagher Bassett should have maintained
25          acceptance of the shoulder injury as work-related;"

26                 (8) "During her deposition (pages 140-145), Ms. Peters explained this
            note but could not say if her assertions about Walker's bilateral shoulders
27          and back complaints were true (141:5-10);" (9) "Mr. Walker testified that he
            never complained of problems with his right shoulder (D. Walker Depo.,
28          22:13-15). The references to bilateral shoulder and back issues in Ms. Peters'
            note are not supported by any documentation in the claim file."

(9) "Gallagher Bassett initially authorized treatment but later reversed its position without adequate explanation, denying surgery based on an unfounded assertion that the left shoulder injury was not related."

(10) "Making a false accusation to justify otherwise unjustified claim-handling actions is not a reasonable or customary claim practice."

(11) "Gallagher Bassett's failure to critically assess this conflict [in the two IME reports] was below standard and led to unnecessary delays in providing needed care."

(12) "The decision to deny further surgery, even after Dr. Steingart's consistent recommendations, demonstrates a willful disregard for clear medical evidence."

(13) "Gallagher Bassett's insistence on denying surgery reflects a bias towards cost-saving over the well-being of the injured worker."

(14) "[T]he adjuster merely documented that no benefits were due because the employer provided modified duty."

(15) "Despite clear evidence from Dr. Steingart and other medical professionals documenting Walker's work restrictions and loss of earning capacity, Gallagher Bassett continued to withhold TPD benefits."

(16) "Gallagher Bassett's failure to appropriately evaluate and act upon this testimony further underscores their deviation from reasonable claims-handling practices."

(17) "[Elizabeth Taylor's] opinions disregard the proper principles of workers' compensation claims handling and demonstrate a biased attitude leading to unjustified denials."

(18) "Peters implied that the adjuster's role was not to assist the injured worker or ensure proper benefits were issued in a timely manner."

(19) "Peters claimed to not know that the original claim had been erroneously notified to the wrong insurer."

(20) "Mendivil failed to recognize the urgency in resolving the compensability issue."

(21) "Mendivil continued to cast doubt on the compensability of the injury."

(22) "[Mendivil] acknowledged that due to her caseload, claims were not always handled on time: 'Sometimes the claim fell off diary.'"

(23) "Mendivil's reluctance to fully accept the claim, despite consistent medical evidence and a lack of substantial contrary evidence, reflects a bias against the claimant. Her failure to acknowledge the established facts resulted in unnecessary delays, as she stated: 'I don't have any knowledge, actually.'"

(24) "A reasonable adjuster would have resolved the compensability issue sooner, accepted the established medical evidence, and ensured timely

payments, avoiding the delays and unnecessary litigation caused by the improper denial pending investigation."

(25) "Although Gallagher Bassett argued that payment of estimated permanent disability benefits was discretionary, industry standards require that any reasonable carrier exercise this discretion appropriately when the claimant cannot return to full pre-injury duties."

(26) Gallagher Bassett failed to promptly investigate the two key criteria needed to determine whether Mr. Walker had a loss of earning capacity – namely, the availability of suitable jobs in the open labor market and the compatibility of those jobs with Mr. Walker's work restrictions, training, and experience."

(27) "Gallagher Bassett's failure to [consider both the suitability of available jobs and their availability in the open labor market] resulted in unnecessary delays in providing Mr. Walker's benefits."

(28) "Gallagher Bassett's decision to ignore [the Labor Market Consultant's] findings for several months was inconsistent with industry standards."

(29) "Industry standards dictate that any reasonable carrier will promptly pay benefits once they are determined to be payable. Despite having the necessary information, this delay in making payments was an unreasonable deviation from standard claims handling practices."

(30) "The delay in issuing permanent disability benefits from May 31, 2022, until December 2022, was not justified by any substantive investigation or new evidence. Gallagher Bassett had all the necessary information to make the payments months earlier."

(31) "Gallagher Bassett's reliance on Dr. Zoltan's opinion, failure to act on the LMC's findings, and prolonged delays in benefits payments all constitute unreasonable claims-handling practices that resulted in unnecessary hardship for Mr. Walker. Gallagher Bassett's continuous delays in delivering medical and income benefits frustrate the workers' compensation system's focus on delivering expedited benefits. A reasonable insurer would have recognized that the investigation had been sufficiently completed and that further delay was unjustifiable."

(Doc. 102 at 8–10, quoting from Mr. Flood's expert report at Doc. 102-2).

"Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind," because "[t]he jury is sufficiently capable of drawing its own inferences" on such matters. *Hunton v. Am. Zurich Ins. Co.*, No. CV-16-00539-PHX-DLR, 2018 WL 1182550, at *2 (D. Ariz. Mar. 7, 2018) (quoting *Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013)). Accordingly, while experts may testify about a defendant's conduct in a bad faith action, and how that conduct

deviated from or aligned with industry standards, they cannot draw any inferences regarding the defendant's mental state based on that conduct. *Id.* (permitting plaintiff to present expert opinions of the defendant's "pervasive claims handling failures," but prohibiting testimony on the defendant's knowledge or state of mind); *Roberts v. Garrison Prop. Cas. & Ins. Co.*, No. CV-19-01232-PHX-SPL, 2021 WL 3909918, at *6 (D. Ariz. Sept. 1, 2021) (allowing testimony about the defendant's "actions in relation to applicable [insurance] industry standards," but barring expert conclusions about the defendant's "motives or mindset in pursuing that course of conduct").

On this record, it appears many of Mr. Flood's opinions fall within the permissible area for expert testimony. For example, opinion (28) states: "Gallagher Bassett's decision to ignore [the Labor Market Consultant's] findings for several months was inconsistent with industry standards." (Doc. 102 at 10). This opinion permissibly outlines how Defendants' conduct deviated from standard claims handling practices. However, some of these opinions less clearly fall within the permissible area for expert testimony. For example, opinion (13) states: "Gallagher Bassett's insistence on denying surgery reflects a bias towards cost-saving over the well-being of the injured worker." (Doc. 102 at 9). This opinion could be interpreted as an impermissible reference to the motives behind Gallagher's claims-handling decisions.

Because none of these opinions fall so clearly outside the permissible scope of expert testimony, the Court will not preclude them at this time. This ruling is without prejudice to Defendants re-raising an objection at trial if such objection is justified at that time.

f.   Financial Incentives

Defendants contend Mr. Flood "opined that the adjusters were compensated on reduced claim payments . . . [and] that Defendants shared financial obligations," and ask the Court to strike such testimony. (Doc. 102 at 11). Mr. Flood's report contains none of the opinions Defendants allege.

1

g.  <u>Timeliness of Supplemental Report</u>

2  Plaintiffs filed a supplement to Mr. Flood's expert report on February 14, 2025. Mr.

3  Flood supplemented his initial report to account for "newly obtained information"

4  regarding the handling of Mr. Walker's claim, including: (1) the deposition of the nurse

5  case manager, Mary Mucahy ("NCM"), (2) previously undisclosed emails between the

6  NCM and Cemex/Gallagher, (3) Mr. Sarkisov's non-retained expert disclosure, and (4)

7  financial data on AIU. (Doc. 102-9). Defendants argue the supplemental report should be

8  stricken as untimely because the opinions contained in the report concern material

9  Plaintiffs either had in their possession or had access to prior to the October 18, 2025,

10  expert witness disclosure deadline. (Doc. 102 at 12–13). Plaintiffs respond that Defendants

11  did not provide the requested NCM emails until January 8, 2025, and that the emails

12  revealed "critical new information." (Doc. 113 at 15). However, a few pages later,

13  Plaintiffs concede that "some of this information does relate to previously known

14  information" and merely "amplifies what is known about the circumstances." (Doc. 113 at

15  17). Plaintiffs note that Mr. Flood's reference to Mr. Sarkisov's disclosure "was also

16  referenced in . . . Flood's original report." (Doc. 113 at 17). Plaintiffs claim "the disclosure

17  of financial information is harmless" because "it comes from the Defendant's own report."

18  (Doc. 113 at 17).

19  The Court's Rule 16 Scheduling Order set the following deadline for supplemental

20  disclosures: "[A] party must serve [Rule 26(e)] supplemental responses in a timely manner,

21  **but in any event no later than 30 days after the information is discovered by or**

22  **revealed to the party**." (Doc. 30 at 2). Based on this deadline, it appears that Mr. Flood's

23  supplement, dated February 13, 2025, and filed the next day, is untimely.[8]

24  ───────────────

[8] Mary Mucahy (the NCM) was deposed on December 13, 2024. (Doc. 113-13 at 1).

25  Plaintiffs obtained the requested NCM emails on January 8, 2025. (Doc. 113-11 at 1–10).
Mr. Sarkisov's disclosure was dated October 18, 2024. Mr. Flood referenced "industry-

26  standard sources widely used across the insurance sector for assessing insurers' financial
strength" to support his new opinions on AIU's financial data. (Doc. 102-9 at 6). Although

27  Mr. Flood's supplement does not indicate when he became aware of these "industry-
standard sources," it appears as though he could have referenced this (presumably public)

28  material when authoring his original report. As for the remaining materials referenced in
Mr. Flood's supplement—Plaintiffs' counsel "discovered"/gained access to those materials
more than 30 days before disclosing the supplement. Counsel should have supplied those

Further, Mr. Flood's updated opinions are not true supplemental opinions as contemplated by Rule 26(e). Rule 26(e) requires a party to "supplement or correct" its disclosure "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *see also Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1269 (D. Ariz. 2020) ("Supplementation means correcting inaccuracies or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998) (cleaned up))). However, "[a] supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c)." *Krause*, 459 F. Supp. 3d at 1269 (quoting *Plumley v. Mockett*, 836 F.Supp.2d 1053, 1062 (C.D. Cal. 2010)).

Mr. Flood's supplemental report does not serve to supplement or correct an incomplete or incorrect report—the supplement merely bolsters opinions articulated in the original report. Indeed, the supplement states that (1) "[t]he newly obtained records, deposition testimony, and financial data *further substantiate my prior findings* that Gallagher Bassett's handling of Mr. Walker's claim deviated from industry standards in multiple respects," and (2) "[t]hese findings *reinforce my previous conclusions* regarding Gallagher Bassett's unreasonable claim-handling practices." (Doc. 102-9 at 6–7) (emphasis added). Plaintiffs' own motion concedes that the supplemental disclosure's contents "amplif[y] what is known about the circumstances." (Doc. 113 at 17). That is not the function of a Rule 26(e) supplemental disclosure.

Because the supplement is beyond the scope of proper supplementation and is untimely, it is subject to preclusion unless Plaintiffs, as the party responsible for the inadequate disclosure, can prove it is "substantially justified or harmless." Ariz. R. Civ. P.

---

materials to Mr. Flood sooner to comply with the Court's supplemental disclosure deadline. (Doc. 30 at 2).

37(c)(1); *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Plaintiffs' response merely states that "the disclosure of [AIU's] financial information is harmless" because the financial information "comes from the Defendant's own report." (Doc. 113 at 117). Because Defendants' reply does not acknowledge Plaintiffs' harmlessness argument, but merely reargues the timeliness issue, they waived any challenge to Mr. Flood's testimony regarding AIU's financial information. *See Webb v. Frawley*, 906 F.3d 569, 581 (7th Cir. 2018) (by failing to respond to Defendant's argument in his reply brief, Plaintiff "waived any counterargument he may have had").

Plaintiffs fail to provide any other explanation as to why the inadequate and untimely disclosure was harmless or substantially justified. Accordingly, Plaintiffs have failed to satisfy their burden, and the Court will grant Defendants' request to preclude the remainder of Mr. Flood's supplemental disclosure. Mr. Flood's testimony will be limited to the opinions contained in his original report, and the opinion regarding AIU's financial data contained in his supplemental disclosure.

### h.  Conclusion

In sum, the Court will grant in part and deny in part Defendants' motion to exclude Mr. Flood's testimony.

### 2.  George Sarkisov

Plaintiffs list Mr. George Sarkisov, Mr. Walker's workers' compensation attorney in the underlying ICA proceedings, as a non-retained expert. (Doc. 103-1 at 1). Plaintiffs disclosed Mr. Sarkisov to testify regarding his representation of Mr. Walker, including his knowledge of Mr. Walker's medical history and the steps he took to secure benefits. Defendants move to exclude Mr. Sarkisov's testimony, or, alternatively, to limit his testimony to facts known based on his personal knowledge. (Doc. 103 at 7).

### a.  Non-Retained Expert Status

Defendants allege that the following statements in Mr. Sarkisov's non-retained disclosure constitute "legal opinions" and "state of mind testimony":

a. "Under the Act, an employer is allowed to designate an initial visit with a physician of the employer's choice, for the injured worker. Often this

designated physician ends up becoming the treating physician, when the injured work is not advised of their right to choose their own doctor."

b. "The Defendants denied any surgery."

c. "The Defendants refused to authorize the FCE."

d. "Pursuant to that litigation, the Defendants eventually authorized the FCE."

e. "Pursuant to that litigation, the Defendants eventually paid for the FCE."

f. A MSR "is a form generally required by carriers each month when an injured worker is on a modified duty status, in order to pay disability benefits."

g. "The Defendants just stopped paying any disability benefits, without notice to Mr. Walker or Mr. Sarkisov, beginning March 12, 2022."

h. "Neither of these MSRs were timely paid or responded to."

i. "Pursuant to that litigation, the Defendants eventually paid the disability benefits at issue."

j. "In addition, pursuant to the litigation for pre-surgical disability benefits, the Defendants paid TPD for the period 1/15/21 through 12/4/21 on 7/6/22."
k. "The Act allows a carrier to close a claim no more than 30 days retroactive to the Notice of Claim Status. . . . Benefits should be paid through the effective dates on the NCS, May 31, 2022. Due to Mr. Sarkisov's objections, and potential litigation, the Defendants paid benefits for the period 5/18/22-5/31/22 on July 25, 2022."

l. "In response, the Defendants denied the surgery, and sent Mr. Walker to a second periodic medical examination with the same physician as before."
m. "Mr. Walker, by that point, had become frustrated with the process. He had endured significant periods of waiting for medical care, while litigation took place. He had endured significant periods without wages, or inadequate wages, while[e] litigat[ing] for disability benefits. He state[d] he could no longer afford to remain out of work, waiting for benefits during litigation over serial denials. He state[d] he would forego surgery so he could get back to work."

n. "On July 8, 2022, the Industrial Commission notified the Defendants that their form of Notice of Claim Status, issued on June 30, 2022, was improper, and needed to be resubmitted."

o. "Mr. Sarkisov will explain[] that under the Act, the carrier is required to 'promptly determine the average monthly wage' of an injured worker, in all cases in which compensation is payable. A.R.S. §23-1061(F). This determination is to be made within 30 days of the first installment of compensation being made. In addition, under the Act, TTD benefits are to be paid no later than every 14 days. A.R.S. §23-1062(C). TPD/PPD (Permanent Partial Disability) benefits are to be paid no later than every 30 days. *Id.* 'The first installment of compensation is to be paid no later than the twenty first-day after written notification by the Commission to the carrier of the filing of a claim unless the right to compensation is denied.' *Id.* Medical benefits

are to be authorized promptly upon notice. A.R.S. §23-1062(A)."

p. "Defendants did not file their required recommended average monthly wage (form 108), with the Industrial Commission until May 4, 2022."

q. "The Defendants' closing notices of June 30, 2022, and August 2, 2022 closed Mr. Walker's claim with an unscheduled permanent impairment. Shoulder impairments are unscheduled disabilities under the Act, and pay a monthly PPD benefit of 55% of the difference between average monthly wage, and earning capacity with the impairment. Even though he disputed closure of the claim, the permanent impairment determination entitled Mr. Walker to estimated PPD benefits even while the litigation for continuing active medical care/temporary disability benefits, was ongoing. A.R.S. §23-1047. Mr. Sarkisov made a request for these benefits to the carrier, effective [as] of the May 31 closure date. The Defendants did not pay these benefits until December 29, 2022."

r. Mr. Sarkisov will explain that under the Act, entitlement to disability benefits is determined by two earning capacity criteria. First[,] what work is suitable for the injured worker based on his training, education, experience, and residual impairment. Second[,] is there suitable employment reasonably available in the injured workers' applicable labor market."

s. "Under the Act, once a carrier designates an injured worker with an unscheduled disability, the carrier must submit certain information to the ICA within thirty days. This is to include complete information necessary for the Industrial Commission to determine what the injured workers' permanent disability benefit should be. Mr. Sarkis[ov] will further testify it is customary for the carriers to submit a labor market report indicating the medical parameters of suitable employment, what positions are reasonably available in the pertinent labor market, and a computation of disability benefits due. That did not occur until November of 2022."

t. "Instead on July 22, 2022, the Defendants' attorney submitted a recommendation to the ICA that Mr. Walker should not receive any PPD benefits. The attorney's letter was premised only on the fact that the Defendants' periodic medical examination had released Mr. Walker back to work without any restrictions."

u. "Mr. Sarkisov will further testify that even if the release without restrictions was correct, which it was not, that does not equate to an absence of PPD. The attorney's letter completely failed to address the availability of employment at a wage equal to what Mr. Walker was earning prior to his injury. It was undisputed at the time that Mr. Walker had been let go from Cemex, so that reasonable availability of alternative employment had to be considered."

v. "Pursuant to the protest of closure, and request for continuing benefits, the Industrial Commission issued its Decision, Findings and Award in favor of Mr. Walker on May 30, 2023. However, the Defendants' attorney filed a request for review on June 12, 2023, asking the ICA to reverse its decision. Defendants alleged Mr. Walker did not want to have surgery, so it should not be awarded. Mr. Sarkisov filed a Response on June 27, 2023 stating that Mr. Walker wanted and needed the surgery. On July 19, 2023 the Defendants' attorney filed a supplemental request for review, that was not authorized under the rules. Mr. Sarkisov filed a Motion to Strike and on August 2, 2023,

the Defendants withdrew their request for review."

w. "In the interim, Mr. Walker changed his medical care to Dr. Gruber, due to a change in the nature of Dr. Steingart's practice. Mr. Walker eventually received the surgery, recommended by Dr. Steingart, on November 7, 2023.

x. "Mr. Sarkisov will testify about the various steps and timeframes involved in each of the litigation processes. This will include the discovery conducted. Mr. Sarkisov will explain that attorney fees for injured workers are generally at 25% of disability benefits, with no fees taken from medical benefits. Because all costs, such as depositions, or litigation related medical exams, must be paid from the injured workers' disability benefits, most often these types of expenses are not incurred. Temporary disability benefits are paid at 66% of the difference between average monthly wage and earning capacity. Permanent disability benefits are paid at 55% of average monthly wage and earning capacity. Reduced wages, coupled with the 25% attorney fee, make it difficult to survive."

y. "Defendants, however, frequently take depositions and hire periodic medical examiners under A.R.S. §23-1026."

(Doc. 103 at 3–6, quoting from Mr. Sarkisov's non-retained expert disclosure at Doc. 103-1). Defendants broadly conclude—with no individual analysis for any of the statements—that "these examples show [] Mr. Sarkisov's testimony goes beyond that of a fact witness," and that Mr. Sarkisov is in fact an expert witness who will "opine on his opinion of the law" without providing the bases and reasoning for such opinions. (Doc. 103 at 6-7). Defendants contend that the lack of an expert report should result in exclusion of Mr. Sarkisov as a witness. (Doc. 103 at 3). In response, Plaintiffs argue that Mr. Sarkisov's observations are not legal opinions or state of mind testimony. (Doc. 110 at 5). Plaintiffs contend that Mr. Sarkisov's disclosure limits his testimony to his observations handling the case before the ICA. (Doc. 110 at 2).

Federal Rule of Civil Procedure 26 governs the disclosure requirements for two types of experts: (1) those "retained or specially employed to provide expert testimony," and (2) those who are not specifically employed to testify, but who may still provide expert testimony. Fed. R. Civ. P. 26(a)(2)(B)–(C). A witness "retained or specially employed to provide expert testimony" must author a written expert report. Fed. R. Civ. P. 26(a)(2)(B). A percipient expert witness is not required to write an expert report but must still disclose a statement regarding the subject matter of the witness's testimony and a "summary of the

facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *Lambert*, 2016 WL 3193252, at *1.

A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and provide expert testimony under Evidence Rule 702, 703, or 705. Fed. R. Civ. P. 26, 2010 Advisory Committee Note. "Indeed, lay witnesses may testify to particularized knowledge by virtue of their experiences even if the subject matter is specialized or technical, because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *Montalvo v. Am. Fam. Mut. Ins. Co.*, No. CV-12-02297-PHX-JAT, 2014 WL 2986678, at * 5 (D. Ariz. July 2, 2014) (cleaned up). Treating physicians generally fall into this non-retained expert category because they "are a species of percipient witness" hired to treat patients and testify to their observations and actions during treatment. *Goodman v. Staples the Off. Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011). Importantly, "a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement *to the extent that his opinions were formed during the course of treatment*." *Id.* at 826 (emphasis added). Once a treating physician's testimony morphs into that of a witness hired to provide expert opinions beyond the scope of the treating doctor's personal observations, "the proponent of the testimony must comply with Rule 26(a)(2)[B])." *Id.* at 819–20.

Non-retained experts are not limited to treating physicians—this designation may extend to other individuals with specialized knowledge that testify as percipient witnesses. *See United States v. Losch*, 603 F. Supp. 3d 795, 798-99 (D. Ariz. 2022) (permitting engineers who had special knowledge, skill, experience, training, and education "to testify as lay witnesses with personal knowledge of the evaluations they made and communicated to [the defendant]"); *see also Sidi Spaces LLC v. Aluminum Trailer Co.*, No. CV-19-01476-PHX-SRB, 2020 WL 4383814, at *1 (D. Ariz. June 2, 2020) (noting "non-retained experts are not limited to treating physicians" and concluding "[a]n individual . . . [with] extensive business training and experience [who] derived his opinions as the CEO of Plaintiff rather than for purposes of litigation, may be able to offer expert opinions at trial without the

1    extensive disclosure otherwise required by Rule 26(a)(2)(B)").

2        It follows then, that *Goodman*'s "course of treatment" limit on non-retained treating

3    physicians extends to other non-retained expert witnesses. Mr. Sarkisov is a workers'

4    compensation attorney and was disclosed as a non-retained expert witness to testify

5    regarding his "prosecution of various issues on behalf of Donald Walker, at the Industrial

6    Commission of Arizona." (Doc. 103-1 at 1).  As a non-retained expert with specialized

7    knowledge regarding workers' compensation law, Mr. Sarkisov may testify about the law

8    without writing an expert report if his testimony is limited to his representation of Mr.

9    Walker. *See Goodman*, 644 F.3d at 826. Mr. Sarkisov would only be subject to Rule

10   26(a)(2)(B)'s expert report requirement if he morphed into a witness to offer opinions

11   beyond the scope of that representation.

12       The Court's review of Defendants' quotations from Mr. Sarkisov's disclosure show

13   that is not the case here. Mr. Sarkisov's disclosure largely explains the factual timeline of

14   his representation of Mr. Walker, spanning from the time he filed his Notice of Appearance

15   in August 2021, to the time that Mr. Walker received surgery in November 2023. (Doc.

16   103-1). Plaintiffs acknowledge that eleven of the twenty-five statements defendants cited

17   from Mr. Sarkisov's report (items a, f, k, o, q-u, e, y) "involve elements of specialized

18   knowledge," as "they are references to specific processes involved in the handling of Mr.

19   Walker's claim" under the Workers' Compensation Act ("the Act"). (Doc. 110 at 5).

20   Indeed, Mr. Sarkisov's disclosure references various provisions of the Workers'

21   Compensation Act and details different steps to perfect a workers' compensation claim.

22   His disclosure discusses, in part: certain forms used in workers' compensation proceedings;

23   when a carrier may close a claimant's claim; the difference in benefits payable for a

24   temporary total disability (TTD) versus a permanent partial disability (PPD); and the

25   criteria used to determine a claimant's entitlement to disability benefits. (Doc. 103-1 at 4-

26   8).

27       Explaining the ICA litigation necessarily requires Mr. Sarkisov to engage in some

28   explanation of the portions of the Act giving rise to Mr. Walker's claims against

Defendants. But stating the law that guided Mr. Sarkisov in obtaining Mr. Walker's benefits does not transform or "morph" his testimony into expert witness testimony necessitating an expert report. Nor does it mean that Mr. Sarkisov is providing his "opinion of the law" and "apply[ing] his opinion to Defendants' conduct," as Defendants allege. (Doc. 103 at 7). Mr. Sarkisov's disclosure merely references the portions of the Act relevant to his representation of Mr. Walker and states the facts of Defendants' conduct throughout the ICA litigation. The Court notes, however, that Mr. Sarkisov may only testify about the law insofar as it relates to his percipient knowledge of his representation of Mr. Walker.

The Court finds that Mr. Sarkisov is properly designated as a non-retained expert witness and was not required to author a report pursuant to Rule 26(a)(2)(B).

### b.  Timeliness and Content of Supplemental Disclosure

On January 17, 2025, Plaintiffs filed a supplemental disclosure for Mr. Sarkisov, seeking to expand Mr. Sarkisov's testimony to include his (1) 18 years of experience practicing before the ICA, (2) opinion that the same physicians, including Dr. Zoltan (Defendants' non-retained expert/treating physician), regularly appear on behalf of insurance companies and insurance defense lawyers, and (3) opinion that Dr. Zoltan "has established a reputation for bias and dishonesty." (Doc 103-2).

Defendants argue the offered opinions lack basis or foundation and that the disclosure is untimely. (Doc. 103 at 7). Plaintiffs counter that the supplement was timely under the Rule 16 Scheduling Order's February 14, 2025, supplements deadline. (Doc. 110 at 10). The Court's Rule 16 Scheduling Order stated that while February 14, 2025, marked the close of discovery, that deadline in no way altered the parties' duties under Rule 26(e). (Doc. 30 at 2). The Scheduling Order requires parties to "serve [Rule 26(e)] supplemental responses in a timely manner, **but in any event no later than 30 days after the information is discovered by or revealed to the party**." (Doc. 30 at 2). Plaintiffs' supplemental disclosure appears to be untimely because it does not explain *when* Mr. Sarkisov developed or discovered the opinions contained in the disclosure. Plaintiffs'

response argues the disclosure did not prejudice Defendants because they filed the supplement "well before" the discovery deadline, allowing Defendants the opportunity to respond. (Doc. 110 at 10). Defendants' reply makes no response to Plaintiffs' prejudice argument and instead argues about whether Mr. Sarkisov should be permitted to testify to the opinions contained in the supplemental disclosure. (Doc. 115 at 2-5).

Evidence that is not timely disclosed is automatically excluded unless the late disclosure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The party making the late disclosure—here, Plaintiffs—has the burden of proving that the delay was substantially justified or harmless. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Plaintiffs argued the disclosure did not prejudice Defendants, and Defendants, by failing to respond to Plaintiffs, waived any argument that the untimely disclosure was not harmless. *Webb*, 906 F.3d at 581. Accordingly, the supplemental disclosure will not be precluded on timeliness grounds.

Considering the supplemental report on the merits, the Court finds that Mr. Sarkisov's proposed opinion testimony about Dr. Zoltan is inadmissible. Plaintiffs disclosed Mr. Sarkisov to testify regarding his "prosecution of various issues on behalf of Donald Walker, at the Industrial Commission of Arizona." (Doc. 103-1 at 1). Mr. Sarkisov's opinion about Dr. Zoltan's alleged reputation for bias and dishonesty— developed over the course of Mr. Sarkisov's career as a workers' compensation attorney— goes beyond his percipient observations from his representation of Mr. Walker. Further, the supplement is devoid of any analysis about the basis of Mr. Sarkisov's opinion—it merely concludes that, "in Mr. Sarkisov's experience," the majority of Dr. Zoltan's opinions "find in favor of the complete denial of benefits to the injured worker." (Doc. 103-2 at 1-2). Plaintiffs would have needed to disclose Mr. Sarkisov as an expert, and obtained an expert report explaining the facts and data supporting Mr. Sarkisov's opinion of Mr. Zoltan, if they wished to elicit such testimony.

c.  Medical Opinions

Defendants argue that Mr. Sarkisov's disclosure describes Mr. Walker's medical care

1    and "appears to proffer opinions about what the doctors recommended." (Doc. 103 at 8-9).

2    Because Mr. Sarkisov does not hold a medical degree, Defendants argue he lacks any

3    specialized knowledge, skill, or experience in the medical field and is thus unqualified to

4    offer any opinion regarding the doctors' opinions in this case. (Doc. 103 at 9-10). In

5    support, Defendants include the following six examples of Mr. Sarkisov's improper

6    "medical testimony":

> (1) Dr. Steingart reviewed the MRI, noting pathologies in the rotator cuff,
> labrum, and biceps tendon, in addition to a frozen shoulder. Dr. Steingart
> recommended surgery to correct all these problems.
>
> (2) [The IME] physician opined that Mr. Walker's shoulder complaints were
> caused by the industrial injury, and that the frozen shoulder was related to
> the industrial injury. But he stated the other pathology shown on MRI were
> pre-existing conditions.
>
> (3) Dr. Steingart recommended a functional capacity evaluation to determine the
> extent of function and impairment remaining in Mr. Walker's left shoulder.
>
> (4) Following the December 2021 manipulation under anesthesia, Mr. Walker's
> shoulder pain and loss of function did not resolve. Dr. Steingart
> recommended that Mr. Walker have a surgery to address all the pathologies
> found in this shoulder. Dr. Steingart wrote multiple reports explaining that
> these pathologies were related to the industrial injury, for reasons including
> Mr. Walker had worked in labor for a long time, and never had any shoulder
> problems until the industrial injury.
>
> (5) The IME "physician said that Mr. Walker's shoulder complaints were not the
> result of the industrial injury, and that all the pathologies found on MRI were
> pre-existing.
>
> (6) He eventually determined that he needed to have surgery, if he could, to help
> control the pain.

(Doc. 103 at 9, quoting from Mr. Sarkisov's non-retained expert disclosure at Doc. 103-1).

These examples are not medical opinions. The examples are Mr. Sarkisov's

descriptions and summaries of the factual medical chronology of Mr. Walker's case. As

Mr. Walker's workers' compensation attorney, Mr. Sarkisov was tasked with reviewing

physician medical reports to inform his position and effectively advocate on Mr. Walker's

behalf to obtain benefits. As Plaintiffs note in their response, Mr. Sarkisov's knowledge

about the physicians' opinions was "foundational to his participation on the [workers'

compensation] claim." (Doc. 110 at 8). Nothing in Mr. Sarkisov's disclosure opines about

the correctness of the physician opinions. His disclosure recounts nothing more than facts

1    with respect to the medical chronology of the underlying workers' compensation claim.

2                          d.  <u>Claims-Handling Testimony</u>

3        Defendants contend that Mr. Sarkisov is unqualified to offer testimony about

4    claims-handling decisions, and that such testimony would not aid the jury. (Doc. 103 at

5    10). Defendants fail to identify any testimony from Dr. Sarkisov's disclosure that discusses

6    claims handling.  The Court's independent review of the disclosure revealed no testimony

7    opining about the reasonableness of Defendants' decisions regarding Mr. Walker's claim.

8                          e.  <u>Conclusion</u>

9        In sum, the Court will grant in part and deny in part Defendants' motion to exclude

10   Mr. Sarkisov's testimony. Defendants' request is granted with respect to Mr. Sarkisov's

11   January 17, 2025 supplemental disclosure, but is otherwise denied.

12                      **3.  Dr. Steingart**

13       Plaintiffs list Dr. Michael Steingart as a designated medical expert. Defendants

14   move to limit or exclude Dr. Steingart's testimony.

15                      a.  <u>Claims-Handling Testimony</u>

16       Defendants seek to limit his testimony by striking "any of opinion of Dr. Steingart

17   that goes to claims handling." (Doc. 104 at 1).  Defendants identify the following portions

18   of Dr. Steingart's report as claims handling opinions:

19
20       a.  The delay between May 2022 and November 2023 did have a negative
         impact on Mr. Walker.

21       b.  **I was told he was "cut off."**

22       c.  The delay caused Mr. Walker to worsen his condition, as one might
         expect, to dissue [sic] atrophy and further range of motion loss.

23       d.  In January from the second MRI, it was clear that the labrum/biceps
24          needed repair. **That was denied as well.** Conditions worsen over time.
            That is a general rule accepted by most orthopedic surgeons. **His claim
25          was closed.** The dissue [sic] of the arm only worsened.

26       e.  Mr. Walker's impairment rating worsened because of the lack of
            treatment between May 2022 until November of 2023.

27       f.  It is my opinion and in all medical probability had Mr. Walker been
28          authorized to undergo the proposed surgery in May 2022, the impairment
            rating would have improved; since there would not have been muscular
            atrophy excessive range of motion loss, or lessening [sic] of Mr. Walker's

shoulder strength.

g.  In my opinion and in all medical probability had Mr. Walker been given approval for the surgical procedure recommended he would not have had the severe restrictions he has today.

(Doc. 104 at 2-3, quoting from Dr. Steingart's expert report at Doc. 104-1). Defendants argue Dr. Steingart failed to identity who told him that Mr. Walker had been "cut off" and that there is thus "no basis for what appears to be an attempt to offer hearsay into evidence." (Doc. 104 at 2).

None of the language Defendants quote from Dr. Steingart's report are claims-handling opinions. Indeed, the only references to Mr. Walker's workers' compensation claim are in subsections b. and d. (bolded above). These are not opinions about how Defendants adjusted Mr. Walker's claim. Rather, they are factual statements noting that Mr. Walker had not been authorized for surgery, and that his claim was later closed. Dr. Steingart's report, beyond noting which procedures were authorized or denied, makes no comment about Gallagher's claims-handling decisions.

To the extent that Defendants interpret Dr. Steingart's opinions about the surgery delay and its impact on Mr. Walker as "opinions on claims handling," the Court disagrees. Dr. Steingart's report does not opine about the reasonableness of Defendants actions or otherwise express an opinion—good or bad—about how Defendants adjusted Mr. Walker's claim. Dr. Steingart merely used the facts of this case—including the 18-month surgery delay—and explained how, in his opinion, it impacted Mr. Walker's medical outcome. And Defendants' hearsay argument is an issue for trial—if Dr. Steingart testifies at trial that he was told Mr. Walker was "cut off" in May 2022, Defendants may raise a hearsay objection at that time.

b.  Rebuttal Report

Dr. Steingart authored a report to rebut Defendants' medical expert's (Dr. Gendy) report. (Doc. 104-2 at 2). Defendants move to exclude Dr. Steingart's rebuttal report, arguing it is untimely and does not contain "true rebuttal opinions." (Doc. 104 at 3-4).

Defendants contend that the rebuttal report—dated December 18, 2024, and

produced December 20, 2024—is untimely because Plaintiffs' expert witness designation deadline was October 18, 2024. (Doc. 104 at 3). Defendants correctly identify October 18, 2024, as Plaintiffs' expert witness disclosure deadline, as outlined in the Rule 16 Scheduling Order. (Doc. 30 at 1). But Defendants apparently ignored the scheduling order's separate deadline for expert rebuttal reports—"The party with the burden of proof on the issue shall make its rebuttal expert disclosure, if any, no later than December 20, 2024." (Doc. 30 at 2). Defendants' motion acknowledges that Plaintiffs produced Dr. Steingart's rebuttal report on December 20, 2024. (Doc. 104 at 3). The rebuttal report is timely.

Defendants also contend the rebuttal report should be stricken because the report largely criticizes Dr. Zoltan's IME reports and does not offer true rebuttal opinions. (Doc. 104 at 3). For the first time in their reply, Defendants attempt to categorize Dr. Steingart's report as a "supplemental report," arguing that Dr. Steingart "could have opined on these medical records in his original designation," and thus should not be permitted to offer "new" opinions.[9] Rule 26(a)(2)(D) permits parties to disclose rebuttal opinions, which are opinions "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). "The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006). Such testimony is proper if the rebuttal expert witnesses "speak to the same subject matter the initial experts addressed and do not introduce novel arguments." *Walsh v. LG Chem Am.*, No. CV-18-01545-PHX-SPL, 2021 WL 11878781, at *1 (D. Ariz. Mar. 15, 2021) (quoting *Laflamme v. Safeway*, *Inc.*, Case No. 3:09-cv-00514-ECR-VPC, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010)).

Dr. Gendy's report states that: (1) "By October 2021 . . . Mr. Walker did not want to proceed with surgery for the SLAP," and (2) "[t]he extended timeline from the original

---

[9] Because Defendants did not raise this argument in their initial motion, the Court need not address it. *Zamani*, 491 F.3d at 997 ("The district court need not consider arguments raised for the first time in a reply brief.").

1  incident in January 2021 to the authorization in August 2023 was primarily due to Mr.

2  Walker's earlier decision to decline SLAP surgery, as documented in Dr. Zoltan's IME

3  report from May 2022." (Doc. 108-1 at 2-3). In essence, Dr. Gendy's report attributes the

4  delay in surgery to Mr. Walker. Dr. Steingart's rebuttal report contradicts this opinion,

5  noting that he was unable to perform the necessary surgery because he "was never given

6  the authorization to treat Mr. Walker properly." (Doc. 104-2 at 11-12). Dr. Steingart's

7  report does exactly what a rebuttal report is designed to—it rebuts Dr. Gendy's opinion on

8  the same subject matter, i.e., the cause of the surgery delay.

9                          c.  Causation Testimony

10        Finally, Defendants request that "any opinion on causation of Defendants' conduct

11  be excluded," (Doc. 104 at 4) and that Dr. Steingart's testimony be "limited to opinions

12  concerning his medical treatment of Mr. Walker while he was the ICA recognized treating

13  doctor." (Doc. 114 at 4). To support this request, Defendants summarily state that there is

14  no foundation or disclosed basis for Dr. Steingart's opinion that Mr. Walker's medical

15  condition was causally related to Defendants' conduct. (Doc. 104 at 3).

16        Dr. Steingart's report concludes that the delay in surgery worsened Mr. Walker's

17  condition and that Mr. Walker's medical outcome would have been better had he been

18  authorized to receive surgery sooner. (Doc. 104-1 at 24–25, 30–32). Dr. Steingart is a

19  board-certified orthopedic surgeon with over thirty years of experience. (Doc. 109-5 at 1).

20  Dr. Steingart's education and experience qualify him to speak on the causal connection

21  between the delayed surgery and Mr. Walker's post-surgery outcome. Defendants'

22  contention that there is no foundation for Dr. Steingart's causation testimony is

23  unsupported and incorrect. *Wilke v. Transportation Ins. Co.*, No. CV-16-04055-PHX-JJT,

24  2019 WL 2611026, at *3 (D. Ariz. June 26, 2019) (concluding that a doctor's education,

25  training, and experience as an orthopedic surgeon for over thirty years qualified him to

26  testify about medical causation).

27                          d.  Conclusion

28        In sum, the Court will deny Defendants' motion to exclude or limit Dr. Steingart's

1    testimony.

2    **C.  Conclusion**

3    For the stated reasons, the Court will grant in part and deny in part Defendants'

4    Motion to Exclude Testimony from Elliot Flood (Doc. 102) and George Sarkisov (Doc.

5    103). The Court will deny Defendants' Motion to Exclude testimony from Dr. Steingart.

6    (Doc. 104).

7    **V.    GALLAGHER'S MOTION FOR SUMMARY JUDGMENT**

8    Gallagher filed a motion for summary judgment on Plaintiffs' claims, arguing it

9    cannot be held liable for bad faith because Gallagher did not owe Plaintiffs a duty to engage

10   in good faith and fair dealing and was not engaged in a joint venture with AIU. (Doc. 106

11   at 6–13). Gallagher also argues that Plaintiffs' punitive damages claim fails as a matter of

12   law and that the bad faith action is wholly barred by the statute of limitations. (Doc. 106 at

13   13–15). In response, Plaintiffs abandon the joint venture theory of liability raised in the

14   complaint and argue that Gallagher is liable under a direct liability theory.  (Doc. 122 at

15   10–14).

16   **A.  Legal Standard**

17   Summary judgment is appropriate when "the movant shows that there is no genuine

18   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

19   Fed. R. Civ. P. 56(a). Summary judgment is mandated "against a party who fails to make

20   a showing sufficient to establish the existence of an element essential to that party's case,

21   and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

22   477 U.S. 317, 322 (1986).

23   The moving party "bears the initial responsibility of informing the court of the basis

24   for its motion and identifying the portions of [the record] which it believes demonstrate the

25   absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the

26   nonmovant to establish the existence of material fact. *Id.* A dispute about a fact is

27   "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-

28   moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A material fact

1    is any factual issue that may affect the outcome of the case under the governing substantive

2    law. *Id.* In the summary judgment context, the Court "construes all disputed facts in the

3    light most favorable to the non-moving party." *Ellison v. Robertson*, 357 F.3d 1072, 1075

4    (9th Cir. 2004)

5           **B. Discussion**

6           Federal courts sitting in diversity jurisdiction apply relevant state substantive law

7    and federal procedural law. *Cty. of Orange v. United States Dist. Court*, 784 F.3d 520, 527

8    (9th Cir. 2015). In Arizona, an implied covenant of good faith and fair dealing exists in

9    every contract. *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). This duty ensures

10   that "neither party will act to impair the right of the other to receive the benefits which flow

11   from their agreement or contractual relationship." *Id.*  In the insurance context, "[t]he tort

12   of bad faith arises when the insurance company intentionally denies, fails to process[,] or

13   [fails to] pay a claim without a reasonable basis for such action," *Noble v. Nat'l Am. Life

14   Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981), and in certain other circumstances, *Zilisch v. State

15   Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000).

16          Gallagher contends that, because it has no contractual relationship with Mr. Walker,

17   Gallagher did not owe him any duties and cannot be liable for allegedly breaching the duty

18   of good faith and fair dealing. (Doc. 106 at 6–7).

19          As noted, the duty of good faith and fair dealing sounds in contract. It is undisputed

20   that Gallagher never contracted with Mr. Walker. (Doc. 106 at 3). Gallagher is a third-party

21   administrator hired by Cemex to adjust Mr. Walker's workers' compensation claim on

22   AIU's behalf. (Doc. 106 at 2) As Gallagher notes, there is at least some caselaw suggesting

23   that non-parties to an insurance contract do not owe an insured any duties and cannot be

24   liable for bad faith. *Walter v. F.J. Simmons & Others*, 818 P.2d 214, 222 (Ariz. Ct. App.

25   1991) (superior court dismissed a third-party claims adjuster "from the bad faith claim

26   because he owed no contractual duty to act in good faith or deal fairly with [the insured]");

27   *see also Centeno v. Am. Liberty Ins. Co*., No. CV-18-01059-PHX-SMB, 2019 WL 568926,

28   at *2 (D. Ariz. Feb. 12, 2019) (dismissing plaintiff's bad faith claim against a third-party

- 48 -

administrator because plaintiff had no contractual relationship with the administrator); *Ndwiga v. Plaza Ins. Co.*, No. CV-18-02324-PHX-SPL, 2020 WL 7016448, at *6 (D. Ariz. Mar. 13, 2020) ("[A] direct cause of action for bad faith will not lie against a third-party claim administrator where there is no contractual relationship with the insured."); *McGhee v. Sedgwick Claims Mgmt. Servs. Inc.*, No. CV-19-08003-PCT-DLR, 2019 WL 1598032, at *2 (D. Ariz. Apr. 15, 2019) (third-party claims administrator "cannot be directly liable for breaching the covenant of good faith and fair dealing because it is not a party to the insurance contract from which that covenant derives").

However, a bad faith claim may survive absent a contractual agreement with an insured under joint venture, direct liability, instrumentality, and alter-ego theories of liability. *Sparks v. Republic Nat. Life Ins. Co.*, 647 P.2d 1127 (Ariz. 1982) (joint venture); *Farr v. Transamerica Occidental Life Ins. Co. of California*, 699 P.2d 376 (Ariz. Ct. App. 1984) (same); *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725 (Ariz. 1991) (alter-ego, instrumentality, and direct liability theories).

Although Plaintiffs initially advanced a joint venture theory of liability in the complaint, they abandoned this theory in their response to Gallagher's summary judgment motion. (Doc. 132 at 16). Plaintiffs, citing *Gatecliff v. Great Republic Life Insurance Company*, now argue that Gallagher is directly liable "as the agent causing harm." (Doc. 132 at 10). In *Gatecliff*, the Arizona Supreme Court considered whether a parent insurance company (GRW) could be held separately liable for the acts of its subsidiary (GRC), who issued plaintiffs' insurance policy. 821 P.2d at 170 Ariz. at 726–27. Although GRW had no contractual privity with the plaintiffs, the *Gatecliff* court concluded there was sufficient evidence to withstand summary judgment under a direct liability theory because of GRW's "direct involvement in the cancellation of [a plaintiff's] benefits." *Id.* at 730–31. In reaching this conclusion, the Arizona Supreme Court favorably quoted several Colorado and California cases, which reasoned that "adher[ing] to the general rule that 'bad faith' liability may be imposed only against a party to an insurance contract . . . would . . . deprive a plaintiff from redress against the party primarily responsible for damages," and "would

1    permit [a defendant] to shield itself from liability through the device of a management

2    company." *Gatecliff*, 821 P.2d at 730 (first quoting *Delos v. Farmers Grp.*, 155 Cal. Rptr.

3    843, 849 (Cal. Ct. App. 1979); then quoting *Farmers Group, Inc. v. Trimble*, 768 P.2d 1243

4    (Colo. App. 1988)).

5            In *Midtown*, this Court, relying on *Gatecliff*, refused to dismiss a reinsurer from a

6    bad faith action. *Midtown Hotel Grp. LLC v. Selective Ins. Co. of Am.*, No. CV-22-01395-

7    PHX-JAT, 2023 WL 3603677 (D. Ariz. May 23, 2023). There, the plaintiff sued its

8    insurance company and the company's reinsurer, Hartford. *Id.* at *1. Hartford argued it

9    must be dismissed because it had no contractual relationship with the plaintiff. *Id.* at *3.

10   This Court found that the plaintiff adequately stated a bad faith claim against Hartford

11   under a direct liability theory notwithstanding the lack of contractual privity because the

12   complaint alleged Hartford: (1) "was responsible for handling its claim under the

13   reinsurance agreement,"; (2) "accepted coverage of [the plaintiff's] claim,"; (3) "was

14   responsible for paying some or all of the claim,"; and (4) "controlled decisions regarding

15   the settlement and payment of the claim." *Id.* at *5. This Court reasoned that dismissing

16   the complaint would allow Hartford "to use its claims control rights under the reinsurance

17   agreement as a sword against policyholders to minimize payments while simultaneously

18   using its contractual distance as a shield against liability for any bad faith it might

19   perpetrate." *Id.* Allowing dismissal, then, "would deprive the plaintiff of redress against

20   the party primarily responsible for its damages."  *Id.*; *see also Gatecliff*, 821 P.2d at 730.

21            Plaintiffs urge this Court to allow their claim against Gallagher to proceed under

22   *Gatecliff*'s direct liability theory. However, the close relationship between the parent and

23   subsidiary insurance companies in *Gatecliff*, and the financially co-dependent relationship

24   between the insurer and reinsurer entities in *Midtown*, are fundamentally different than the

25   relationship between Gallagher and AIU in this case. In *Gatecliff*, the parent insurance

26   company cancelled the plaintiff's benefits and exercised "substantially total control" over

27   nearly all of its subsidiary's operations. 821 P.2d at 728.  An administrative agreement

28   between the parties established that GRW (parent) did far more than just process claims on

GRC's (subsidiary) behalf—indeed, GRW "performed virtually *every* service necessary for GRC's operation," including underwriting, billing, and premium collection and accounting. *Id.* at 728–29, 731. And in *Midtown*, the reinsurer was both: (1) in control of the claims handling decisions, *and* (2) financially incentivized to deny claims because the reinsurer was liable for paying some or all of the claim. 2023 WL 3603677, at *5.

Gallagher is a third-party administrator hired by Cemex for the sole purpose of adjusting Mr. Walker's claim on AIU's behalf. (Doc. 106 at 2–3). The following facts are undisputed:

1. Defendant, AIU was not an agent of Gallagher.

2. Gallagher did not participate in the profits and losses related to the workers' compensation policy issued by AIU to Cemex.

3. Gallagher was paid a flat fee for adjusting Donald Walker's workers' compensation claim.

4. While Gallagher issued checks to pay workers' compensation benefits, Gallagher does not fund the payment of workers' compensation benefits from its own money.

5. Gallagher had no financial interest in whether Donald Walker's claim was paid or disputed.

6. Gallagher was never offered nor received incentive compensation related to increased revenue savings on workers' compensation claims of Cemex employees adjusted by Gallagher on behalf of AIU.

7. Gallagher did not receive a commission on collected premiums related to the workers' compensation policy issued by AIU to Cemex.

8. Gallagher did not receive a percentage of any renewal commission related to any workers' compensation policy issued by AIU to Cemex.

9. Gallagher never entered into a contract with Donald Walker or Judith Walker.

10. Gallagher did not enter into a contract of insurance with Plaintiff's employer, Cemex.

11. Gallagher did not prepare any sales brochure or otherwise sell or market the AIU workers' compensation policy to Cemex or any other entity.

12. Gallagher did not underwrite the workers' compensation policy issued by AIU to Cemex.

13. Gallagher did not issue certificates of insurance under the workers' compensation policy issued by AIU to Cemex.

1

      14. Gallagher did not bill or collect premiums under the workers' compensation policy issued by AIU to Cemex.

2

(Doc. 106 at 2–3, Doc. 132 at 9). Plaintiffs concede that Gallagher was neither obligated

3

to pay Mr. Walker's claim or financially incentivized to deny his claim. Plaintiffs only

4

argue that "all claims handling decisions were made by Gallagher" and that the third-party

5

claims administration agreement conferred Gallagher "substantial authority." (Doc. 132 at

6

9). The agreement between Gallagher and Cemex provides that Gallagher shall: "Upon

7

guidance from [Cemex] and/or retained counsel, where applicable, review, investigate,

8

adjust, settle and/or resist Claims: (i) within the Settlement Authority, or (ii) if in excess of

9

the Settlement Authority, upon the written acknowledgment of [Cemex]." (Doc. 132-1).

10

This agreement, without more, is insufficient to support a direct liability theory against

11

Gallagher. There is no relationship between Gallagher and AIU and no evidence that

12

Gallagher was motivated to adjust Mr. Walker's claim a particular way. Without such

13

evidence, and given the lack of contractual privity between Gallagher and Mr. Walker, the

14

Court will grant Gallagher's motion for summary judgment.[10]

15

    **C. Conclusion**

16

      For the stated reasons, the Court will grant Gallagher's Motion for Summary

17

Judgment on Plaintiffs' bad faith and joint liability claims. Because Plaintiffs have no

18

remaining claim to support their request for punitive damages, their punitive damages

19

claim as to Gallagher is moot. *Quiroga v. Allstate Ins. Co.*, 726 P.2d 224, 226 (Ariz. Ct.

20

App. 1986) ("[T]he right to an award of punitive damages must be grounded upon a cause

21

of action for actual damages."). Because the Court is granting Gallagher's motion on other

22

grounds, the Court declines to address its statute of limitations argument.

23

24

---

[10] Plaintiffs also argue that "established public policy" supports a finding that Gallagher

25

owed Mr. Walker a duty to engage in good faith and fair dealing. (Doc. 132 at 14). Plaintiffs cite to A.R.S. § 23-930, which provides workers' compensation claimants an

26

administrative remedy for unfair claims processing or bad faith by a "claims processing representative." (Doc. 132 at 15). Plaintiffs contend that this statute, as a matter of public

27

policy, supports the idea that "claim representatives should be accountable for the harm they directly cause." (Doc. 132 at 15). A.R.S. § 23-930 allows claimants to bring unfair

28

claim processing or bad faith complaints before the Industrial Commission of Arizona. This statute has no bearing on whether, under Arizona law, third-party claims adjusters owe insureds a duty of good faith and fair dealing.

1      **VI.    AIU'S MOTION FOR SUMMARY JUDGMENT**

2           AIU argues: (1) Plaintiffs' claims are time-barred by the statute of limitations and

3      (2) that it is entitled to summary judgement on Plaintiffs' punitive damages claim. (Doc.

4      105 at 5, 12). The Court addresses each argument in turn.

5           **A.  Legal Standard**

6           As noted above, summary judgment is appropriate when "the movant shows that

7      there is no genuine dispute as to any material fact and the movant is entitled to judgment

8      as a matter of law." Fed. R. Civ. P. 56(a). The Court "construes all disputed facts in the

9      light most favorable to the non-moving party." *Ellison*, 357 F.3d at 1075.

10          **B.  Discussion**

11                1.  <u>Statute of Limitations</u>

12          AIU argues that Plaintiffs' bad faith claim fails as a matter of law because it is barred

13     by the statute of limitations.

14          Because it is a personal injury done to another, bad faith must be "commenced and

15     prosecuted within two years after the cause of action accrues." A.R.S. § 12-542; *see also*

16     *Ness v. W. Sec. Life Ins. Co.*, 851 P.2d 122, 125 (Ariz. Ct. App. 1992).  "A limitations

17     period starts when the cause of action arises." *Ness*, 851 P.2d at 125. In the insurance

18     context, the tort of bad faith occurs in Arizona when, without a reasonable basis, an insurer

19     intentionally denies, fails to process, or fails to pay a claim. *Zilisch*, 995 P.2d at 279.

20     Therefore, Plaintiffs' cause of action did not arise, and their limitations period did not begin

21     to run, until Defendants intentionally denied, failed to process, or failed to pay Plaintiffs'

22     claim without reasonable basis. Plaintiffs filed their claim on July 27, 2023, meaning that

23     the statute of limitations barred claims for any conduct occurring before July 27, 2021.

24     (Doc. 21 at 6).

25          AIU argues that Mr. Walker's bad faith claim accrued when his workers'

26     compensation claim was denied on March 8, 2021. (Doc. 105 at 6). But AIU already made

27     a statute of limitations argument in its Motion to Dismiss. (Doc. 9 at 3–5). The Court

28     previously considered this argument and found that because the "statute of limitations . . .

at most began to run on August 24, 2021," Plaintiffs' bad faith claim was timely. (Doc. 21 at 6–7). AIU does not acknowledge and, indeed, appears to ignore the Court's previous ruling on this matter.

To the extent that AIU intends its statute of limitations argument to operate as a motion for reconsideration of the Court's prior ruling, it is untimely by more than seven months. LRCiv 7.2(g) ("Absent good cause shown, any motion for reconsideration [under Local Rule 7.2(g)] shall be filed no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion."). Even considering AIU's argument as a timely filed motion for reconsideration, the Court finds Plaintiffs' claims are not barred by the statute of limitations.

"A motion for reconsideration is appropriate where the district court '(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law.'" *Brown v. Brnovich*, No. CV-22-00166-PHX-JAT (MHB), 2022 WL 1239207, at *1 (D. Ariz. Apr. 27, 2022) (quoting *Sch. Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)). A motion for reconsideration cannot "repeat any argument previously made in support of or in opposition to a motion," or be based on a party's "mere disagreement with a previous order." *Id.*

Although AIU's motion largely re-urges the arguments offered in its motion to dismiss, it does offer one new argument based on evidence obtained during discovery, which the Court will consider. AIU cites to Mr. Walker's deposition and alleges that he "knew in January of 2021 that he was not receiving his full pre-injury wage." (Doc. 105 at 6). AIU then notes that a workers' compensation claim accrues "when the damaged party realizes he or she has been damaged." (Doc. 105 at 7) (citing *France v. Arizona Counties Ins. Pool*, 519 P.3d 1029, 1031–32 (Ariz. Ct. App. 2022). AIU reasons that "because Mr. Walker was aware that he was not receiving workers' compensation benefits to compensate his lost wages following the injury when the March 8, 2021 denial was issued, he knew or should have known of his damages and the cause of action accrued as of that date." (Doc.

105 at 7).

AIU seems to misunderstand the difference between the accrual of Mr. Walker's workers' compensation and bad faith claims. This is a bad faith action. The relevant question is not when Mr. Walker became aware of his injuries for purposes of filing a timely workers' compensation claim. Rather, the key inquiry is when AIU, as his insurer, intentionally denied, failed to process, or failed to pay his claim without a reasonable basis. *Zilisch*, 995 P.2d at 279.

Mr. Walker's bad faith claim did not accrue on March 8, 2021, as Defendants allege. As the Court discusses at greater length in its previous Order, the March notice was an equivocal denial "pending investigation," which did not trigger the limitations period. (Doc. 21 at 6). Gallagher issued an unequivocal denial of benefits on August 24, 2021. (Doc. 21 at 6). Plaintiffs timely filed this bad faith action within two years of that denial.

AIU did not argue that Plaintiffs' bad faith claim should be dismissed on its merits. Accordingly, Plaintiffs' bad faith clam against AIU remains and will proceed to trial.

## 2. Punitive Damages

Punitive damages are recoverable in a bad faith action "when, *and only when,* the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent." *Rawlings,* 726 P.2d at 578. Punitive damages may not be awarded "unless the evidence reflects 'something more' than the conduct necessary to establish the tort [of bad faith]." *Id.* at 577. The insured must prove that the insurer's wrongful conduct was guided by an "evil mind" by providing evidence that the insurer "(1) intended to injure the [insured], (2) was motivated by spite or ill will, or (3) acted to serve [its] own interest, having reason to know and consciously disregarding a substantial risk that [its] conduct might significantly harm [the insured]." *Walter*, 818 P.2d at 225.  The insurer must be "consciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, or intolerable in that it creates a substantial risk of tremendous harm to others" to demonstrate an evil mind. *Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1183 (9th Cir. 1988) (quoting *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675,

679 (Ariz. 1986)). The insured must prove entitlement to punitive damages by clear and convincing evidence. *Walter*, 818 P.2d at 225.

AIU argues that Plaintiffs' punitive damages claim should be dismissed because Mr. Walker's claims were not denied "with spite, malice, or a fraudulent or evil motive" to justify imposing punitive damages. (Doc. 105 at 9). Because "questions existed regarding entitlement to benefits," AIU argues that the punitive damages claim fails as a matter of law. (Doc. 105 at 10). Plaintiffs respond that "the facts are fairly interpreted as a deliberate, and evil, effort to disclaim coverage known to be valid, in the face of disclosed harm." (Doc. 133 at 16).

In determining whether to authorize Mr. Walker to receive arthroscopic surgery, Gallagher considered conflicting evidence. Although Dr. Steingart, Mr. Walker's treating physician, pushed for authorization to perform surgery and opined that Mr. Walker needed such treatment, Dr. Zoltan rebutted this opinion in his May 2022 IME report. Dr. Zoltan concluded Mr. Walker's shoulder symptoms were unrelated to the industrial injury and that he was medically stationary.

If both doctors testify to that effect at trial, the Court would be inclined to grant summary judgment in AIU's favor on punitive damages because it is unlikely that a reasonable jury could find it acted with an "evil mind" given the conflicting medical evidence. *Lange*, 843 F.2d at 1183 ("The fact that an insurer denies benefits based on apparently reputable, although conflicting, evidence is not in itself enough to show the evil mind necessary for punitive damages." (quoting *Gurule v. Illinois Mut. Life and Cas. Co.*, 734 P.2d 85, 92 (Ariz. 1987))); *see also Gurule*, 734 P.2d at 92–93 (overturning jury's award of punitive damages because: (1) there was no "overwhelming" medical evidence that the insurer denied benefits with conscious indifference to the insureds rights, and (2) there was no "evidence to justify an inference that [the insurer] arranged for 'independent' medical examinations with disreputable doctors, tried to influence the doctors' opinions, or purposefully withheld information from them"); *Jones*, 2015 WL 1806726, at *7 (granting summary judgment on punitive damages claim despite "evidence that Defendant

was abusing the IME system" because "there is no evidence [Defendant] did so with the intent to harm Plaintiff"; *Linthicum*, 723 P.2d at 682 (concluding that evidence of an insurance company's practice of "constru[ing] its policy strictly in its own favor" and "denying all claims upon any possible supportable basis" is relevant to a bad faith claim, but is insufficient to support a punitive damages claim).

However, there remains an open evidentiary question as to whether Dr. Zoltan will be allowed to testify at all. Specifically, Plaintiffs have suggested that an IME doctor retained in an underlying workers' compensation case can never be a non-retained expert subject to Rule 26(a)(2)(C)'s disclosure requirements. (Doc. 108 at 2, 5). Because Dr. Zoltan did not create an expert report under Rule 26(a)(2)(B), he will be precluded from offering expert testimony at trial unless he qualifies as a non-retained expert witness. As indicated above, *supra* page 10, the Court has accepted the issue of whether an IME doctor may be a non-retained expert as moot for purposes of this summary judgment order. (Doc. 108 at 5). However, at this time, it is unclear how this issue will be resolved at trial. If Dr. Zoltan *is* wholly precluded from offering expert testimony, it is possible that Dr. Steingart's testimony—i.e., that Plaintiff required surgery, and that the delay in obtaining surgery negatively impacted his ultimate medical outcome—will be undisputed. In that circumstance, a reasonably jury might award punitive damages.

Thus, on this record and at this time, the Court will deny AIU's motion for summary judgment on punitive damages.

### C. Conclusion

For the stated reasons, the Court will deny AIU's Motion for Summary Judgment on all claims.

## VII.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' Motion to Exclude Testimony from Dr. Gendy, Dr. Zoltan, and Multiple Non-Retained Expert Witnesses (Doc. 108) is **denied in part** and **granted in part** as specified above.

1    **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Testimony of

2    John Beringer (Doc. 107) is **denied**.

3    **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Testimony of

4    Elliot Flood (Doc. 102) is **denied in part** and **granted in part** as specified above.

5    **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Testimony of

6    George Sarkisov (Doc 103) is **denied in part** and **granted in part** as specified above.

7    **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Testimony of

8    Dr. Michael Steingart (Doc. 104) is **denied**.

9    **IT IS FURTHER ORDERED** that Gallagher's Motion for Summary Judgment

10   (Doc. 106) is **granted** on all claims. The Clerk of the Court shall not enter Judgment at this

11   time.

12   **IT IS FURTHER ORDERED** that AIU's Motion for Summary Judgment (Doc.

13   105) is **denied**.

14   **IT IS FURTHER ORDERED** that Defendants' Motion for Leave to File a Sur-

15   Reply (Doc. 124) is **denied as moot**.

16   Dated this 29th day of August, 2025.

17

18

19

20                                        James A. Teilborg
                                          Senior United States District Judge

21

22

23

24

25

26

27

28